## THE VILLAGE OF ITASCA

*v.*

## ERNEST C. SCHROEDER.

*Opinion filed October 19, 1899.*

1. INJUNCTION—*when injunction will not be denied on ground of remedy at law.* An injunction suit against a municipality to restrain its officers from so changing a street as to encroach upon his property, necessitating the removal of his fences, the destruction of shade trees, and resulting in permanent damage to his lands, will not be denied on the ground of an adequate remedy at law.

2. SAME—*what a compliance with statute authorizing an injunction to issue without notice.* It sufficiently appears that the rights of the complainant will be unduly prejudiced if an injunction is not issued immediately and without notice, under section 3 of the Injunction act, (Rev. Stat. 1874, p. 579,) when such fact is averred in the bill, and the complainant's affidavit to the bill is positive, and not upon information and belief.

3. EVIDENCE—*location of monument in survey may be shown by extrinsic evidence.* The location of an old bridge which is a monument in an old road survey may be established by extrinsic evidence in a controversy concerning the location of a road.

4. APPEALS AND ERRORS—*chancellor's finding of fact from oral testimony is not lightly disturbed.* A finding of the chancellor based on conflicting oral testimony will not be disturbed on appeal, as against the evidence, in the absence of clear and palpable error.

5. MUNICIPAL CORPORATIONS—*when a village is estopped to change location of street.* A municipal corporation which has acquiesced for forty years in the location of a street, which it has worked and improved at various times, and in the making of permanent improvements with reference thereto by adjoining owners, is estopped from so changing its location as to encroach upon the grounds of an abutting property owner.* '

6. SAME—*an execution for costs should not be awarded against a municipal corporation.* An execution for costs should not be awarded against a municipal corporation upon the granting of an injunction restraining the corporate authorities from changing the location of a public street.

APPEAL from the Circuit Court of DuPage county; the Hon. CHARLES A. BISHOP, Judge, presiding.

*The rights acquired, as against the public, by adverse possession of a highway or city street, are considered in a note to *Meyer v. Graham,* (Neb.) 18 L. R. A. 146.

This is a bill in chancery filed by Ernest C. Schroeder, the appellee, in the circuit court of DuPage county, to the October term, 1897, of said court, praying for an injunction, against the village of Itasca, impleaded with William Wischsteadt, William Pieper and Edward Pfluger, to prevent them from moving the road-bed of Main street, in the village of Itasca, west fifteen or twenty feet onto the land of complainant. The village of Itasca was not incorporated as a village until March, 1890. The road in question was laid out and platted by the highway commissioners of the town of Addison on the 21st day of November, 1854, and is now known as Main street in the village of Itasca.

The bill, as amended, alleges that complainant, Ernest C. Schroeder, is the lawful owner of the following described property, to-wit: Part of the north-east quarter of the south-west quarter of section 8, township 40, range 11, east of the third principal meridian, beginning at a stone at the north-west corner of the north-east quarter of the south-west quarter of section 8, township 40, north, range 11, east of the third principal meridian; thence south 87 degrees east 2.36 chains to the center of a road as laid out by H. Pierce, surveyor, November 21, 1854, and accepted by the commissioners of highways of the town of Addison February 20, 1855; thence south 33½ degrees east along the center of said highway 9.55 chains; thence south 63½ degrees west 3.27 chains; thence south 14½ degrees east 2.69 chains to the center of the Chicago and Elgin road; thence south 72½ degrees west in the center of said road 5.86 chains to the west line of said forty; thence north one degree east 13.55 chains along the said west line of said forty to the place of beginning, situated in the village of Itasca, DuPage county, Illinois; that he derived title to said premises from one Charles Pierce and wife on the fourth day of October, 1873; that he is now, and always has been since he first acquired title, in the quiet and peaceable occupation, possession and en-

182—13

joyment of the same; that said Pierce held title to the above described premises for many years prior to the date when said premises were conveyed to complainant, and that some time during the year 1854 said Pierce dedicated to the township of Addison, in DuPage county, a strip of land sixty-six feet wide, and adjoining the above described premises on the easterly line thereof, and commencing at a point in the center of Lester street, so called, thence north 33½ degrees west over the bridge across Meacham's creek 20 chains to a post, said strip of land being now known as Main street, in the village of Itasca; that the west line of said Main street of sixty-six feet, as dedicated by said Pierce, has constituted, adjoins and is the easterly line of complainant's property; that said line was marked by a fence, which was erected by said Pierce many years prior to the date when complainant acquired his title, in 1873, and that complainant has ever since that time maintained the said fences in good repair; that at the time when he took title to the said property said Pierce represented and told him that the fence along the easterly line of said premises constituted the westerly line of said road, (now Main street,) and that if such line as marked out by the erection of said fence by Pierce was not the correct line according to the description in the dedication of said street, even then the public has, by lapse of time and non-user, lost all rights to whatever property may be within complainant's enclosure; that he has maintained quiet and peaceable enjoyment of the above described premises, and has been in possession of the same from the date he received the title thereto, to the exclusion of all people, and that his lines, as established by his said fences enclosing said premises for the last forty years, were never questioned or disputed by any one; that on or about the 20th day of August, 1897, the trustees of the village of Itasca employed certain surveyors for the pretended purpose of locating said Main street, as dedicated by Pierce to the

township of Addison, in the year 1854; that said surveyors located the street ten or fifteen feet further west than where the said street has been located for the past forty years or more, and thereby encroaching to that extent upon complainant's property; that certain trustees of the village of Itasca and certain persons named as defendants are changing the road-bed so as to conform with said recent survey, and are removing the sidewalk on the easterly line of said Main street as established by the dedication of Pierce, and are re-building the same much nearer to complainant's property, and are about to enter upon complainant's property, and will remove his fences, plow up his field and cut standing trees, and permanently damage complainant's said lands; that certain members of the village board of Itasca have made threats that they will remove or cause the removal of the fence constituting the easterly line of the said property; that he planted a row of trees, forty or more in number, along the line of his property on the east, which have since grown up to large and magnificent trees, beautifying and greatly adding to the value of his property, and that if the proposed change of the street as contemplated and now in progress of being carried out is made, said trees will have to be cut down and removed, which will be a large and irreparable injury to complainant; that according to the old original lines of said street the property owners on the east side of Main street have encroached upon said street from six to twelve feet, and if said street is to be widened or changed the property owners on the east side of said street ought in equity and good conscience to be the ones to surrender said property to said village, and not an innocent person who has not encroached upon the public right nor intends to do so; that complainant's rights in the premises will be unduly prejudiced, and he will be subjected to great damages and loss, if the injunction is not issued immediately and without notice to the said defendants; prays for an injunction restraining

and enjoining defendants from changing the road-bed of said Main street and also from changing complainant's easterly line.

Defendants filed their answer, in which they deny that Charles Pierce dedicated, at any time, a strip of land to the township of Addison, which is now Main street, in the village of Itasca; aver that in 1854 the proper authorities. of the said township laid out, in due form of law, a street in said village of Itasca, now known as Main street, and which said street lies east of certain premises of complainant; deny that the easterly line of complainant's premises was marked by a fence which was erected by said Pierce many years prior to the date when complainant acquired title, in 1873; deny that complainant has ever since maintained said fences in good repair, or otherwise; aver that complainant has, during the past twelve years, been encroaching upon the public highway known as Main street, which was duly laid out by the authorities of the township of Addison; that said road was laid out before the said village of Itasca was incorporated; that complainant has on several occasions within the past fifteen years moved his fences forward, in an easterly direction, a large number of feet upon said highway; admit they employed surveyors for the purpose of fixing the line of Main street, who found the fences of complainant ten or fifteen feet east of where they ought to be; deny they located the street ten or fifteen feet further west than where the road has been located for the past forty years; deny that by reason of non-user the public lost its right in the property; deny complainant is entitled to relief in a court of equity.

A cross-bill was filed by the village of Itasca and an answer by Ernest C. Schroeder. There was a replication to the answer to the cross-bill, and the cause was heard on pleadings and proof. The court, on the hearing, found the equities of the case to be with complainant, and dismissed the cross-bill for want of equity and entered a

decree making the injunction perpetual. To reverse this decree the defendants have appealed to this court.

J. H. BATTEN, and J. F. SNYDER, for appellant.

FRED A. RATHJE, and BOTSFORD, WAYNE & BOTSFORD, for appellee:

Equity, on a proper showing, will enjoin a threatened trespass. 1 High on Injunctions, (3d ed.) sec. 702, p. 542.

Where a city undertakes, under color of its charter powers, to take possession of land to which it has no right, on the pretense that it has been dedicated as a public street, thereby inflicting on the owner a permanent and continuing injury, the proper remedy is by injunction. *Mt. Carmel* v. *McClintock*, 155 Ill. 608; *Joliet* v. *Werner*, 166 id. 34.

A city may be restrained from encroaching upon the property of a private individual even under the pretense of preventing obstruction of a street. *Carter* v. *Chicago*, 57 Ill. 283.

Mr. JUSTICE CRAIG delivered the opinion of the court:

It is first contended by appellant that the trial court erred in taking jurisdiction of the case,—that appellee had an adequate remedy at law. It is argued by appellant that equity will not enjoin a threatened trespass, and the case of *Goodell* v. *Lassen*, 69 Ill. 145, is cited in support of this doctrine. What was said in that case is still the doctrine held by this court, that "before a court of equity would lend its aid to enjoin a mere trespass, the facts and circumstances must be alleged in the bill, from which it may be seen that irreparable mischief will be the result of the act complained of, and that the law can afford the party no adequate remedy.—*Livingston* v. *Livingston*, 6 Johns. Ch. 497." The facts set out in the bill in the case at bar come clearly within the rule laid down by this court in that case. The allegation in substance is, that certain trustees of the village of Itasca, and certain per-

sons named as defendants, are changing the road-bed of Main street, and are about to enter upon complainant's property, and will remove his fences, plow up his field and cut his standing trees and permanently damage complainant's said lands; that certain members of the village of Itasca have made threats that they will remove or cause the removal of the fence constituting the easterly line of the said property; that he planted a row of trees, forty or more in number, along the line of his property on the east, and which have since grown up to large and magnificent trees, beautifying and greatly adding to the value of his property, and that if the proposed change of the street as contemplated and now in progress of being carried out is made, said trees will have to be cut down and removed, causing large and irreparable injury to complainant. In *City of Joliet* v. *Werner*, 166 Ill. 34, we said, quoting from High on Injunctions (p. 41): "'When a municipal corporation threatens to remove plaintiff's fences as an alleged encroachment upon a street, plaintiff having for thirty years been in the undisturbed possession of the premises, the city having used no portion thereof for a street, and offering no compensation to the plaintiff, and no means of adjusting his compensation for the property to be taken, an appropriate case is presented for relief by injunction.' (High on Injunctions, sec. 584.) A city may be restrained from encroaching upon the property of a private citizen, even under the pretense of preventing the obstruction of a street.—High on Injunctions, secs. 349, 1247, 1272, 1274; *Carter* v. *City of Chicago*, 57 Ill. 283; *City of Peoria* v. *Johnston*, 56 id. 45." See, also, *City of Mt. Carmel* v. *McClintock*, 155 Ill. 608, and *Comrs. of Highways* v. *Green*, 156 id. 504. These cases fully sustain the action of the trial court in issuing an injunction to prevent what the facts and circumstances set out in the bill show would be an irreparable injury.

*Second*—Error is assigned that the injunction was improperly issued without notice, because the oath to the

bill does not state how the rights of complainant will be prejudiced if the injunction is not issued immediately without notice. The statute provides: "No court, judge or master shall grant an injunction without previous notice of the time and place of the application having been given to the defendants to be affected thereby, or such of them as can conveniently be served, unless it shall appear from the bill or affidavit accompanying the same that the rights of complainant will be unduly prejudiced if the injunction is not issued immediately or without such notice." (Rev. Stat. chap. 69, par. 3.) An examination of the bill shows the following averment or positive statement: "That the rights of your orator in the premises will be unduly prejudiced, and your orator will be subjected to great damages and loss, if the injunction in this case is not issued immediately and without notice to said defendants herein." The affidavit attached to the bill is not on information and belief, but Ernest C. Schroeder, the complainant, swears positively to the facts set up. It appears from the facts set up in the bill that the rights of the complainant will be unduly prejudiced, and the affidavit being positive, there was a sufficient compliance with the statute. In the authorities referred to by appellant the affidavits were upon "information and belief," and there was no averment in the bill that the complainant would be unduly prejudiced if the injunction was not issued immediately or without notice.

*Third*—The principal controversy in this case is in regard to the proper location of the road, now called Main street, as laid out by the highway commissioners of Addison township in 1854. This road runs on the east side of complainant's property, and the description in his deed running "to the center of the road," it becomes necessary, in order to correctly locate complainant's east line, to establish the center of this road. S. T. Armstrong, an engineer and surveyor, at the request of appellee made

a survey in 1897, for the purpose of locating this road and establishing the center line. W. S. Gamble, another surveyor, afterwards made a survey for the same purpose, and Armstrong was present, and Gamble testifies: "Armstrong's survey corresponded with my survey; there was no discrepancy between them."

The following is the description by which the road was originally laid out and platted by the highway commissioners across the lands of Charles Pierce, November 21, 1854: "Commencing in the center of the Lester road (so called) near the house of Charles Pierce; thence across Meacham's creek bridge near the house of Dr. E. Smith; thence westerly past and near the house of John Kinney to the town line, being the same route mentioned in the application, which survey is as follows, to-wit: Commencing at a post in the center of the Lester road (so called) near the house of Charles Pierce, on the east half of the south-west quarter of section 8, township 40, north, range 11, east; thence north 33½ degrees west over the bridge across Meacham's creek 20 chains to a post; a locust bears north 33 east distance 62 links; another locust bears north 46 west distance 72 links; thence south 89 west to a stake near the house of J. A. L. Kinney 30.36 chains; a locust bears north 30 west distance 16 links; thence north 78 degrees, west 29 chains 15 links to a stake on the west line of the north-east quarter of section 7, of said township; thence north 77 degrees west 15 chains 75 links to a post on the west line of the said town of Addison. The north-west corner of section 7 bears north distant 25 chains 64 links, passing over lands owned by the following named persons, to-wit: Charles Pierce, E. Smith, J. A. L. Kinney and Lewis E. Landon, Kellogg and the undersigned being of opinion that it is necessary and proper that such road be laid out. It is therefore ordered that a road four rods wide be laid out, and the same is located and laid out according to said survey, and the same is hereby declared to be a public highway."

The plat of the survey made by the highway commissioners laying the road is as follows:

The evidence shows that these surveyors took this original description and plat of the highway commissioners, made when the road was laid out in 1854, and re-surveyed the road from these notes, and found the center line of the road ran to the eastward of the center line, as claimed by appellant; that it laid nearer to the east side than it did to the west side.   A large amount

of evidence was introduced on the hearing, but it will be impossible, within the limits of an opinion, to more than briefly refer to the material parts of the evidence.

Armstrong testifies: "We had with us this plat and description of the highway commissioners. We located the highway. We re-surveyed the road from these notes, and located the highway as indicated by the description on those two pages. The center line of the road, as laid down, did not go out so far west as we went on the ground. We commenced at the quarter section line between lots 1 and 2 of the north-west quarter of section 7, township 40, range 11 east, known as the center point of the road, and deflected that line from this across, as shown here, (indicating,) 78 degrees; followed that line down through to the intersection point as it deflects from these two lines, (indicating,) to the center line east. I mean the center line east and west of the road at that point. Here we deflected another angle equal to the distance between the bearing of the course, north 78 degrees south 89 degrees,—a difference of 3 degrees. That brought us down through the center line of the existing road at that point, and we chained to a point on this (indicating) north-westerly from the bridge. I verified this plat from my notes. I had it before me.

The court: "You say you chained down to a point north-westerly to this bridge?

A. "It was at a point, as shown by this distance, 30 chains and 36 links from the previous deflection angle here (indicating.) Then we turned off a deflected angle equal to the difference between this course south 89 degrees west and north 33½ degrees west. We wanted to get this course north 33½ degrees west. We had to carry that point a little further ahead, (indicating,) so as to make this line pass down across the center of the old bridge as it stood there in an early day, across Meacham's creek, as we could locate it from the piles that stood there, that represented where the old bridge stood. We could tell

from these original piles standing there, that projected about one foot above the water. They are cut off. They are *farther* east than the existing bridge. It is west of those piles. We made this angle run across the *center* of that old bridge. We ran across the center of the old bridge, because the description says, '*over the bridge across Meacham's creek,*' and we could not think there was any other point than the central point.   *   *   *   The *center* line of the road as laid by us ran over the *center point of the old bridge.* The center line of the bridge is the only point in a bridge. Assuming the point in the center of the bridge was correct, by following the course north $33\frac{1}{2}$ degrees west 20 chains, we would be able to lay the center line of that road with all exactness. The center line, as we laid it, ran to the eastward of the center line as now laid. It laid nearer to the east side than it did to the west side. The plat is correct as to the survey."

Gamble also made a survey, and Armstrong was present. Gamble also used the original description and plat of the highway commissioners. He swears: "Armstrong's survey corresponded with my survey; there was no discrepancy between them." He then says: "When I made the survey I had a certified copy of the plat.   *   *   *· I endeavored to find the starting point as recorded in the original plat in the center of the Lester road. I dug up the highway in two different places,—probably a rod square and a foot deep in the center of the Lester road. I found no evidences there. I proceeded then to the next known monument that is recorded in the original plat, which is the location of the highway bridge across Meacham's creek, as specified in the original plat. There were evidences of a former bridge,—four piles, two under the bridge and two outside. These piles were twelve feet, fronting east and west. · After ascertaining these piles I located the center of the north two piles upon the top of the present bridge. The specification was across the bridge. I took the center, because where not spe-

cifically specified we always take the center. That is the universal custom in surveying and engineering. I then deflected the course south 33½ degrees east,—the course given in the original plat. I carried that line to the intersection of the Lester road. I then endeavored to find evidences of an original corner. I did not find any. I then produced a line northerly to the intersection of the highway that comes from the west. I commenced in the center of the Lester road and went northerly 20 chains. That line passed over the center of the bridge. I had then *located the center line as recorded in the original plat.* There is a fence on the west side of the road. That fence lies partly on each side of that west line of the road as I located it. It is shown on the map.　*　*　*
The west line of the street as located by me cuts outside of the fence on the west side of the street as now used. In front of Schroeder's residence it crosses that line about opposite the south face of the factory building.　*　*　*
I noticed some trees along the fence. They are just inside the fence line—the full length of that property frontage. From the factory north there were maple trees—fifteen or sixteen. They were from eight to ten or eleven inches in diameter. Also a large willow tree. There were some pine and evergreen trees in front of his residence.　*　*　*
The center of the *present* bridge is eight feet *westerly* from the center of the old bridge as located by these old piles."

These surveyors of appellee endeavored to find where the old mud bridge was located in 1854 across Meacham's creek, which was a monument established by the survey of the road in 1854. If they located accurately this old bridge across Meacham's creek, then, having the course given, "north 33½ degrees west," it must follow that the center line of the road, now Main street, could be accurately laid. It appears that when the original survey was made there was an old mud bridge, built, as a witness says, by running two logs in and crossed like a milldam. This bridge was afterwards carried out by high

water, and a second—a pile bridge—was built. This pile bridge was located immediately on top of the old mud bridge. A third bridge—the present bridge—is now used to cross this creek, which the evidence shows is west of the old mud bridge. Jerome Lester testifies there have been three bridges across Meacham's creek; that the first one was a mud bridge, which was the one located there in 1854, when the highway commissioners laid out the road. The second one, he says, was a pile bridge, which was located immediately on top of the old mud bridge. He swears, as well as several other witnesses, that the piles of the second bridge are standing there now, and show that the pile bridge and the old mud bridge were located east of the present bridge from eight to ten feet. He says he remembers when the second bridge was put in; that he was attending school in Itasca and had to go and come by that bridge. D. L. Lester, a man seventy-nine years old, says he knows the road called Main street and had traveled it for fifty years; that he knew the old original bridge across Meacham's creek, and remembers when the pile bridge was put in; that there is a bridge there now; that the pile bridge was built right over the old mud bridge; that the present bridge is about ten or fifteen feet west of the old pile bridge; that he remembers when they were working on the pile bridge. J. A. L. Kinney, the same man whose name is mentioned in the old original plat of 1854, testified: "I went to Itasca in 1841. I built my house there in 1842. I am the same J. A. L. Kinney mentioned on that plat. I know Meacham's creek. I was assessor for about twenty years. I know the present bridge that is there. The first bridge I remember was a mud bridge; the second was a pile bridge. They built the pile bridge right where the old mud bridge was,—on top of the bridge, in the same place. The present bridge stands a little west of the pile bridge, from eight to ten feet or twelve." The only witness whose testimony conflicted with these wit-

nesses was Landon, a witness for appellant, who thought, from the best of his information, the old mud bridge was west of the present bridge.

The old mud bridge being a monument in the old survey, it was proper to establish it by extrinsic evidence. (*Choteau* v. *Jones*, 11 Ill. 300; *Chicago Dock and Canal Co.* v. *Kinzie*, 93 id. 415; *Smiley* v. *Fries*, 104 id. 416; *Kleiner* v. *Bowen*, 166 .id. 537.) This testimony clearly establishes the location of this old mud bridge, and the old piles remaining from the pile bridge, which stood directly over the mud bridge, show that these surveyors located accurately the bridge and monument mentioned in the notes of the original survey made by the highway commissioners in 1854. From this monument in the survey they established the center line of Main street, which ran over the center point of this old bridge.

Appellant introduced in evidence a plat made by Prout, Herrick and Russell, the surveyors who were employed by the board of trustees of the village of Itasca, in 1897, to re-locate this road. These surveyors for appellant merely used the description in Schroeder's deed, which was the same as the deed from Charles Pierce to R. W. Gates. Herrick says: "I made my survey of Main street in accordance with Landon's survey, made in 1891. That was the data I followed. If Landon's minutes were incorrect then my survey was incorrect. I used Schroeder's deed to find the center of the street. Landon's minutes called for going down the center of Main street, and in following down the line as I have drawn it on that plat—the dotted straight line—it didn't appear to go down the center of any street. In that particular I thought them to be incorrect. I went north 32 degrees and 53 minutes, while in the highway commissioners' description of the original road that same course runs 33½ degrees west."

Landon, on whose survey Herrick relied, surveyed and drew the deed of the first survey of the Schroeder prop-

erty for R. W. Gates about November, 1866, when it was deeded to Gates by Charles Pierce. He says that he made the description from an actual survey, and that he did not have *any notes, maps, plats or records to guide him in the survey of Main street; that he had never seen the record at that time*, but had the general course of the road as it had been traveled; that in making the survey he always took the section line to tie to, and that he had been used, for twenty or thirty years, to see where the road was or should be, where it had been traveled,—the center track as then used. ;He then describes where he commenced at the north-west corner of north-east quarter of the south-west quarter, thence south 1.86 chains to the center of the road, now known as Main street, and then went south 34½ degrees east, following what, he says, "we term the center of the main traveled road to this point here (indicating on the plat) 9 chains and 55 links to the center of Main street and Schroeder's south-east corner." He says he located the center line of Main street across the creek in 1891 or 1892, when he and Chessman made the survey of the town; that he located the center line of Main street across the creek, *scarcely touching the bridge;* that it struck the south-east corner of the *present bridge;* that he thinks the old mud bridge, as nearly as he can judge, was in the traveled center line of Main street as it was first located, but his present recollection is that the mud bridge was farther west than the present structure three to six feet. The court said to the witness: "The question is whether or not you located the center of that street or simply located the land." And he answered: "I located the land, and the east line of that land is the center line of Main street. I did not testify that I had seen the record at that time." He said he never knew of his own knowledge of a post being at the point,—the center of the Lester road.

Russell says: "When I started to survey the Schroeder property I started from the point designated in his deed as the starting point,—the north-west corner of his prop-

erty,—then ran south 87 degrees east 1.86 chains.    The
spot I reached after running this 1.86 chains is a little
circle in the red dotted line running northerly on the
map.    That red dotted line indicates the center of the
highway, as near as I could arrive at it, in 1854.    That
point was about the center of the road as actually trav-
eled.    The next course I took was 34¼ degrees east 9 chains
and 55 links.    That ran down the center of the road to
the south-east corner of Schroeder's property.    From
thence I went south 63½ degrees west 2.84 chains to the
post at the north-west corner of what is known as Pie-
per's orchard.    Coming back to the place I started from,
that point would be in the center of the road as actually
traveled at the time I made the survey.    From the stake
in the north-west corner of Pieper's orchard I went south
14½ degrees east 2.69 chains to the corner of the Chicago
and Elgin road.    From there I went south 72½ degrees
west 5.96 chains to the division line.    I then ran north
1¼ east along that division line 13.65 chains to the place
of beginning."    The witness says if he were to stand in
the center of the bridge that at some time preceded the
present bridge, and should with his instrument carry a
line south 33½ degrees east, that line as extended would
strike the Lester road, approximately, about twenty feet
east from the stone from which he started.    He says he
verified the center of the road by finding the stone in the
center of the Lester road by Charles Pierce's house.    This
stone was the stone Herrick caused to be set in 1891,
when he says Prout dug down about six inches and they
found a stake badly decayed,—so bad that it crumbled,—
and that stone was then put there within probably ten
minutes.    Wischsteadt and Pieper were there when they
were surveying for the village of Itasca.

These surveyors, Herrick, Prout and Russell, seemed
to have acted upon the assumption that Landon's origi-
nal survey was correct.    They located two points which
appear to have been assumed by Landon,—one in the

center of the road as it then was, at Schroeder's north-east corner, and the other five to ten feet west of the center of the traveled road, at Schroeder's south-east corner, and as counsel for appellee very pertinently say, when these surveyors of appellant extended their center line through these points to the present bridge they find they are twelve to fifteen feet apart. Landon said his center line drawn through these points just touched the south-west corner of the present bridge. Herrick, Prout and Russell say that their center line drawn through these same points was from twelve to fifteen feet *west* of the present bridge. When they extended their center line through these points fixed by Landon, to the Lester road, they found a stake by digging in the center of the Lester road, but it was rotten, and could only be taken out in pieces. Wischsteadt, who was a witness for appellant and was present when the rotten stake was found, says: "We found a stake there about two inches in diameter and twelve inches long. * * * I witnessed James when he drove *one there* about thirty years ago, but I can't swear that was the same stake." (James was county surveyor at that time, or had been one.) "The stake I spoke of being driven about thirty years ago by James was in about the same place where this stake was found. I stood right side of it when it was driven. It was nearly two feet long. It was a piece of an old rail or post. It was two inches thick." Serious doubt is thus thrown on this stake, when the witness describes a stake answering the description of the rotten stake found, and which, as he swears, he saw driven in about the same place more than a decade of years after the original location of the road by the highway commissioners.

This survey of appellant runs the west line of the street through the factory, blacksmith shop and within a very few feet of appellee's residence, and would necessitate the removal of the buildings, one of them built in 1866, and the cutting down of trees planted nearly

twenty-five years ago.  Appellant contends that appel-
lee's fence was moved out, from time to time, from where
it was originally.  Appellee, Schroeder, denies this, and
swears that when he purchased the property of Charles
Pierce, Pierce pointed out the post at the north-west
corner, and said: "That is your line" (pointing to the
black line indicating the fence, on the plat.)  "I mean
the black line on the east—on the east of my place, at
the north end.  I mean the fence line."  He is sure that
when he bought the place the fence was on the west side
of the street, and the east side of his land was there;
that the fence there now is in just the same place where
the rail fence used to be; that the blacksmith shop he
put there in 1873; that he did not build it up to the line
of the street, but about eight feet from the west line, but
cannot tell how far the buildings stand from the road
or fence; that he set out trees all along *inside* this east
rail fence—about twenty inches from the fence; that he
planted them in 1878, and they are now from five to twelve
inches in diameter.  Robert W. Gates, who owned the
premises in controversy before appellee, and who pur-
chased the premises from the original owner, Pierce,
says he ran a cheese factory; that he built this factory
in January or February, 1867; that when he built it, it
stood about seven feet back from the fence and west of
the road; that he went there last summer to see how the
fence that is there compared as to being on the same line
as the fence when he owned the property.  He says: "The
factory is still there.  The house is there, and I set out
some cherry trees in front of the house.  They are the
same as when I lived there.  When I lived on the Schroe-
der property there was a house and factory and a little
barn back of here.  This post-and-rail fence stood there,
and here was the willow hedge (referring to plat).  * * *
In my judgment the fence is within six inches.  It may
vary a little, but I should say it stood exactly where the
fence stood when I owned the property.  * * *  There

was something said to me when I placed the factory where I did, by Mr. Pierce.   I asked him where the line was.   I wanted to place my factory so as to have the platform in front and not get it onto the street.   He told me where the line was.   That fence was the line, so I placed my factory there."   Four other witnesses corroborate this testimony.   Samuels, who lived on the Pierce farm in 1864, says there was then a fence on the east side of appellee's land and the west side of the present road.   He says:   "A year ago I noticed the fence along the west side of the street.   So far as I can see it stands in the same place as the fence stood when I lived there in 1864 and 1865.   It stands about the same distance from the dwelling house.   There was a willow hedge when I lived there.   There was a rail fence and a hedge inside."   Three other witnesses substantiate this testimony.   The survey by the surveyors for appellee is thus confirmed by this testimony.   Gamble testifies: "There is a fence on the west side of the road.   That fence lies partly on each side of that west line of the road as I located it,"— showing there has been no substantial change in the line of fence in over forty years.

Appellant introduced seven or eight witnesses on this question, between whom and appellee's witnesses the testimony is conflicting.   Some had known the property, and claimed the maple trees stood east of the fence three or four feet, and that appellee's fence stands east of where the old rail fence stood, from four to six or eight feet.   Two of the witnesses for appellee had lived upon the land and knew the location of this fence, and corroborate appellee, who had lived there so many years, and are less likely to be mistaken than persons who saw it in merely passing along the road.   Some of defendant's witnesses were defendants in the case or members of the village board of Itasca, or interested in property across the road east from appellee, who might be affected by the result of the suit.   What this court said in *Greenwood* v.

*Fenn,* 136 Ill. 146, is applicable in this case, viz.: "The testimony of the complainant and of defendant Fenn, as well as that of most of the other witnesses, was given orally in court, and the court having thus had an opportunity to see and hear the witnesses was in a much better position to judge of their relative credibility than we can be, with only the record of their testimony before us." We are not prepared to say the finding of the court on these disputed facts was against the preponderance of the evidence. The finding of the chancellor on conflicting evidence stands substantially on the same ground as the verdict of a jury. The error in finding as to facts must be clear and palpable to authorize a reversal. *Coari* v. *Olsen,* 91 Ill. 273; *Patterson* v. *Scott,* 37 Ill. App. 520; *Voss* v. *Venn,* 132 Ill. 14.

None of the witnesses of appellant dispute, or attempt to dispute, the location of the blacksmith shop and factory, as originally located, with reference to the fence, and they stand in the same location as when built. The factory was built in 1866 by Gates, and he placed it seven feet back of the fence, west of the road, and he says the fence is in the same place now. Gamble, the surveyor, says he measured the distance between the east line of the factory building and the fence line in front of the same, and it is seven feet, thus corroborating Gates that the fence is in the same place as in 1866.

A careful examination of the evidence contained in the record, including the plats and maps, convinces us that the surveys of Armstrong and Gamble correctly located the center of the road as originally laid by the highway commissioners from the original notes and plat made in 1854, and that the description in the Schroeder deed, made several years after the road was laid, used by Herrick and Russell, was not the best evidence of the location of the road.

*Fourth*—A municipal corporation, by its acts or acquiescence, may be equitably estopped by reason of its acts.

Appellee swears he went into possession of the premises in question under his deed from Pierce over twenty-five years ago.   There was a fence on the west side of the then existing road and on the east side of his premises as now occupied, which fence, though replaced several times, stands now on the same line as it did when he first took possession, in 1873.   The factory building still stands, and has stood since 1867, in the identical place, within seven feet of the fence on the west side of the road.   He erected his blacksmith shop within about six feet of the fence.   He planted, in 1878, along the inside of the fence, about forty maple trees, which are now from five to twelve inches in diameter, and planted in his front yard shrubbery and ornamental trees.   Appellant claims by its survey and plat that one-half of this factory, a portion of the blacksmith shop, a tenement house, and the maple trees and shrubbery, are within the lines of the street and should be removed.   Appellee swears that from the time he purchased the property and made all these improvements no person, or official of the township or village of Itasca, has made any objection until the resolution passed by the village council of Itasca in 1897; that the public authorities have worked the existing road and graded it down, about six feet from either fence, about two feet; that the authorities have recognized the existing road as the true road, by graveling, plowing and scraping the same at various times.   By these acts, and recognizing the present location of this road, and by their silence and acquiescence, the public authorities are estopped from locating the street further west than where it has been the past forty years.

The circumstances of this case bring it within the case of *City of Joliet* v. *Werner*, 166 Ill. 34, where we said (p. 40): "Where a party lays off lots on his own ground, which are marked by stakes or other visible monuments, and conveys with reference to such boundaries, the grantee will take the same according to the line as actually

run and established, although the grantor may have been mistaken as to the correct location of the line.     \*     \*     \*
We are, moreover, of the opinion that the city is equitably estopped from tearing up the present sidewalk and erecting it farther north, by reason of its acts of recognition of the present location of the sidewalk, as such acts have been above described. Its construction of a sidewalk upon the line of the present sidewalk, its acceptance of the sidewalk already constructed by appellee, the building by it of a culvert up to the present line of the sidewalk, the graveling by it of the street along the present line of the sidewalk, and its levy of an assessment for the purpose of paying the cost of building the walk as at present located, are such positive acts as work an estoppel. While it cannot be maintained that, as respects public rights, municipal corporations are within ordinary limitation statutes, yet the principle of *estoppel in pais* may be applied to such acts by a municipal corporation as have been above designated. In applying the principle of an *estoppel in pais* the courts are left to decide the question, not by the mere lapse of time, but by all the circumstances of the case, and to hold the public estopped or not, as right and justice may require,"
—citing *Chicago, Rock Island and Pacific Railroad Co.* v. *City of Joliet,* 79 Ill. 25; *City of Peoria* v. *Johnston,* 56 id. 45; *City of Mt. Carmel* v. *McClintock,* 155 id. 608; *Martel* v. *City of East St. Louis,* 94 id. 67.

In *Lee* v. *Town of Mound Station,* 118 Ill. 304, we said (p. 317): "It is true that we have held that where the public have long withheld the assertion of control over streets, and private parties have been, by the acts of those representing the public, induced to believe the streets abandoned by the public, and on the faith of that belief and with the acquiescence of those representing the public they have placed themselves, by making structures or improvements in the streets, in a situation where they must suffer great pecuniary loss if those represent-

ing the public be allowed afterwards to allege that the street was not abandoned, the doctrine of equitable estoppel may be applied." *Dickerson* v. *City of Leroy*, 72 Ill. App. 588; *Village of Winnetka* v. *Prouty*, 107 Ill. 218; *City of Decatur* v. *Niedermeyer*, 168 id. 68.

Finally, it is urged that the court erred in ordering execution to issue against appellant for costs. It is true, an execution cannot be awarded against a municipal corporation. In the case at bar execution was properly ordered as to defendants Wischsteadt, Pieper and Pfluger.

We are of the opinion that the decree of the court below dismissing the cross-bill of the village of Itasca, and granting a perpetual injunction against defendants from interfering with the real estate of complainant lying immediately west and adjoining the road, or from in any manner interfering with or disturbing the fence or any of the trees or buildings situated near the same, was proper. The error in ordering execution against the village of Itasca will be corrected by an order entered in this court directing the circuit court to amend its record in that respect. The decree of the circuit court in all other respects will be affirmed.          *Decree affirmed.*