## Charles G. Hutchinson v. Jennie C. Hutchinson.

1. MARRIAGE—*Marriage May Be Valid Without Solemnization by Ceremony.*—A present contract between parties to accept each other as man and wife, and to enter into the marriage relation, is valid and binding when acted upon, although the marriage is not solemnized according to the statute.

2. SAME—*What Evidence Will Establish a Common Law Marriage.*—Evidence that the parties agreed to accept each other as husband and wife, that the woman moved with her accepted husband into a flat where they lived together as husband and wife, that the man introduced and spoke of the woman as his wife, and acknowledged four children by her as his own, will establish a common law marriage.

3. EVIDENCE—*When It Requires Strong Corroboration—Marriage.*—The evidence of a party sued for separate maintenance, which shows that he has little regard for the sanctity of the marriage relation, as well as for the children born to him as the result of many years (as he insists) of illicit and clandestine association with a woman, to receive full credit, where his money interests are involved, needs the strongest corroboration.

4. DECREES—*Not To Be Lightly Disturbed.*—The decree of a chancellor who saw and heard the witnesses in a case where there was conflicting oral testimony will not be disturbed by a court of review unless, upon the whole evidence considered, it can be said that it was clearly and palpably wrong.

Bill for Separate Maintenance.—Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge, presiding. Heard in this court at the October term, 1900. Affirmed. Opinion filed July 8, 1901.

Hutchinson v. Hutchinson.

**Statement by the Court.**—December 16, 1898, appellee filed her bill against appellant for a separate maintenance, alleging in substance that she was married to appellant on "to wit, January 1, 1875," and from that time lived and cohabited with him as his wife until about the month of October, 1884, when, without good cause, he abandoned her and their children and has ever since neglected and refused to provide for them; that four children were born, three of whom were then of lawful age, and the youngest child about fourteen years of age.

Appellant answered the bill, denying the marriage and that he lived and cohabited with appellee as his wife, but admits the cohabitation, though he says it was illicit, and that he is probably the father of said four children, but that they were born outside of the marriage relation; also that in view of the relationship between him and complainant, whose name is Jennie Curtis and not Jennie C. Hutchinson, as alleged in the bill, he entered into an agreement with her on the day of its date, as follows :

"CHICAGO, Oct. 13, 1892.

I, Jennie Curtis, of the city of Chicago, county of Cook, State of Illinois, do hereby certify that I have on this date received from Chas. G. Hutchinson the sum of ($4,100) forty-one hundred dollars, in full of all demands I have or may have against the said Chas. G. Hutchinson, by reason of past relations or for any cause whatsoever; and I further certify that in consideration of the payment of the above sum, the receipt of which I hereby acknowledge, I have this day freely discharged and released the said Chas. G. Hutchinson from any and all claims and obligations to me.

(Signed)    JENNIE CURTIS."

That said agreement was entered into by him for the sole and only purpose of satisfying complainant and compensating her for her past relations with him; that it was freely and voluntarily and without duress of any kind entered into by complainant, and when she signed it, she freely and voluntarily admitted that there was no marriage relationship between her and appellant; that he paid complainant said sum of $4,100 in full settlement of their past relationship.

Replication was filed and the cause heard upon evidence taken and offered in open court before the chancellor during the month of May, 1900, and taken under advisement. Thereafter, on August 8, 1900, by leave of the court, appellee was permitted to amend her bill by striking out the words, "first day of January, 1875," and inserting in lieu thereof the words, "month of April, 1875," this being the time when it is alleged the marriage occurred. On the same day a decree was entered finding the substantial allegations of the bill as amended to be true, and awarding to appellee $100 per month for the support and maintenance of herself and her daughter Violet, to be paid monthly, commencing September 1, 1900, and the further sum of $1,000 for her solicitor's fees in the cause.

From this decree the appeal herein is taken, but no question is raised as to the amount of alimony and solicitor's fees if complainant is found to be entitled to any relief on her bill.

JAMES MAHER and GOODRICH, VINCENT & BRADLEY, solicitors for appellant; ALBERT M. CROSS, of counsel.

BANGS, WOOD & BANGS, solicitors for appellee.

MR. JUSTICE WINDES delivered the opinion of the court.

The only question argued by appellant's counsel is as to whether the evidence is sufficient to justify the finding and decree of the court that appellee and appellant were lawfully married. Appellee relies solely upon a marriage as at common law, which is based upon an agreement which she says was entered into between her and appellant in the month of April, 1875, when no one else was present.

It appears from the evidence that appellee, whose maiden name was Jennie C. Curtis, when about eighteen years of age did general housework in the home of appellant's father, and during that time went to various places, including theaters, with appellant; that about six or seven months after she commenced this work, and in August or September, 1867, she had illicit relations with appellant and became

pregnant with child by him, and he thereafter, while she was in this condition, promised appellee that she should be his wife; that they would get married, but would wait until springtime.  Appellant went away and appellee commenced proceedings against him for bastardy, which he, by the aid of his father, settled, and appellee was paid $100 in cash and given nine notes of appellant of $50 each, a note becoming due each year thereafter for nine years. This child was born July 8, 1868, is now married, and her name is Jennie Schutte.  Some three months after the birth of this child appellant visited appellee and the child at the home of appellee's parents, and soon thereafter (the time not being definitely fixed, but appellant says about two years), he and appellee resumed their illicit relations, which were continued from time to time until the year 1875, when she again became pregnant with a second child.  With regard to these relations and to the agreement of marriage, appellee testifies as follows:

" Our relationship resumed again.  I became in a family way again with my second child.  In the fall of 1874 he said, 'we would get married.'  He didn't set the exact date, but he said 'we would get married.'  I told him that we had to do that by all means, because I could not have that child born under the same conditions as the first child was born, and he said that we would not; he said that we would be married, and that I should be his wife and he would be my husband.  Had conversations with him most every time he came to see me during the fall of the year 1874.  He always promised he would marry me right straight along every time he would come to see me.  Every time he came to see me he talked about getting married, and that we must get married, that we could not raise children under those conditions.  I told him that by all means we must get married, and he said we certainly would."

Q.  "Now, did you have any conversation with him along in the spring of 1875 ?"  A.  " I did."

Q.  " Where ? "  A.  "At my father's home."

Q.  " Where was that ?"  A.  " That was at 44 Market street."

Q.  " Who was present besides yourself and Mr. Hutchinson ? "  A.  " Nobody but Mr. Hutchinson and myself."

Q. " Do you know about what time that was ? "  A.
" As near as I can remember it was the latter part of
April."

Q. " What year ? "  A.  " 1875."

Q. " Now state the conversation that took place and the
circumstances concerning it at that time." A. " Why,
Mr. Hutchinson came to see me one evening. I felt rather
blue and down-hearted. He asked me what was the matter
and I said, ' You know what is the matter.' He said, ' I
do ? ' He says, ' Is that all ? ' I said ' Yes.' He looked at
me for awhile and he says, ' Jennie, are you willing to be my
wife ? ' I said, ' Yes.' He took a ring out of his pocket
and he placed it on my finger and he said, ' I now take you
for my wife.' I said, ' I now take you for my husband.'
He put his arms around my neck and kissed me and he
said, ' Are you satisfied with that ? ' I said, ' Yes.' He
says, ' From this night we are husband and wife.' ' Now,
he says, ' You go and get a flat and we will go housekeep-
ing.' I says, ' I can not leave mother just now, because she
is on the point of death.' ' Well,' he says, ' as soon as you
can.' I says, ' All right.' After that I got a flat at 286
West Congress street, as near as I can remember, in May,
1875. I went to live there with my child, and my husband
came a week after. I refer to Charles G. Hutchinson. I
lived there a year and six months. The second child was
born the 17th of August, 1875. Its name was Charles G.
Hutchinson. Charles G. Hutchinson was not present when
the child was born. It was born about five o'clock in the
afternoon. He came, I think, as near as I can remember,
about seven o'clock."

Appellee, on cross-examination as to the agreement of
marriage, after being told by the court to state the exact
words of the agreement if she could do it, testified as fol-
lows :

Mr. Maher: " Give me the exact words used by him to
you and the exact words used by you to him."

A. " When we got married ? "

Q. " The conversation that you say took place between
you." A. " Mr. Hutchinson came to see me one evening
and I felt rather blue, because I was in a delicate condition
for a second child, and he looked at me and he asked me
what was the matter, and I told him. I says, ' You know
what is the matter.' He says, ' I do ? ' He says, ' Is that
all ? ' I says, ' Yes.' He looked at me for awhile, and he said,

'Jennie, are you willing to be my wife?' And I said, 'Yes.' He then took a ring out of his pocket and placed it on my finger, and he says to me, he says, 'Now I will take you for my wife,' and I said, 'I now take you for my husband.' He placed his arms around my neck and he says, 'Are you satisfied?' I says 'Yes.' He says, 'We are man and wife from this on.' 'Now,' he says, 'Jennie, go and get a flat and we will go housekeeping.'"

After August, 1875, two other children were born to appellee by appellant, the last one, named Violet, being born March 7, 1883.

Appellee lived with her children at 286 West Congress street, Chicago, from about May, 1875, to the year 1882, when she moved to 369 West Lake street, where she lived about two years, and then moved to 365 West Lake street, where she remained up to the year 1888. She rented each of these places herself, and during all that time she and her children were supported by appellant. Appellee does not remember whether she rented the Congress street place in her own name or in the name of appellant, but she says that the places on Lake street were rented in her name, the name of Jennie Hutchinson; but she does not remember whether she gave to the agent from whom she rented on Lake street the name of Jennie Curtis or not. She says that while she was at 365 Lake street she signed two written leases; that Mr. Hutchinson never paid the rent himself, but gave her the money and she sent it by the children to the agent.

During all the time appellee lived at these different places, and up to the year 1884, when he entirely left and abandoned appellee and his children, he lived and cohabited with her and to all outward appearances sustained to her the relation of husband, though he was frequently absent from home, as he explained to her and to his children, on account of business or on hunting and fishing expeditions, as long as six weeks at a time. During that time appellant was known by certain of the friends and acquaintances of himself and appellee as her husband. He acknowledged all the four children as his own, always permitted them, without any remonstrance or objection, to call him papa and

father, and when at home with appellee and his children he always occupied the same bed with appellee. He spoke to different persons of appellee as his wife. From 1875 to 1881, when he died, appellee's father lived in the same house with her, appellant and their children. Appellee says that some people called her Jennie Curtis at that time, because her father lived with her, and admits that her daughter Jennie was registered in school under the name of Jennie Curtis, went by that name and was called by some children, though not all, Jennie Curtis. The children during this time visited very frequently at the home of appellant's parents and called them grandpa and grandma. Appellant's stepmother, his own mother being dead, frequently visited appellee and her children, when they resided on Congress street and on Lake street, and after appellant abandoned appellee, and when she resided upon Randolph street, and frequently brought them presents of oranges, fruit, picture books and other things. She, appellant's stepmother, was also present on the occasion of the birth of one of the children, Grace, February 24, 1879, at the request of appellant, while they were residing at 286 West Congress street. She also went with appellee and her oldest child, Jennie, and was present when the latter was confirmed at the Cathedral of St. Peter and St. Paul. Appellant's father, it appears, was sick during this period and did not visit appellee and her children. The child born in August, 1875, was a son, was named Charles G. Hutchinson, the same name as his father, and has always been known and called by that name without any objection or remonstrance of any kind on the part of appellant, so far as shown by the record. He was at the time of the trial by profession a lawyer. From time to time after appellant abandoned appellee and his children, the two older children, Jennie and Charles G., frequently went to their father, being sent by their mother, to get assistance from him, which he gave at different times, but neither of these children, though the former was thirty years of age and the latter twenty-three years at the time of the filing of the bill, knew that their parents had never

been formally married until appellant filed his answer. Then, for the first time, and from the answer, did they know that appellant claimed he was not legally married to appellee. These two young people certainly knew what was the ostensible relation between appellee and appellant while they lived on Lake street, and the elder knew what it was when their home was on Congress street for about seven years. After appellant's desertion of appellee she says that she often asked him to return to and live with her, and he as often promised that he would, but he never gave her, as she says, any satisfaction as to why he went away. He contributed, after the desertion, to the support and maintenance of appellee and the children different amounts, ranging from $35 to $50 about a year apart, but appellee says " he didn't give on an average a year enough for one child to live on." Appellant, according to his own testimony, is a man of large wealth and worth more than $275,000, besides numerous Chicago city lots and buildings thereon, and several large farms, though he says that he never provided in any manner for the two older children. He says he never gave any of the children money when he was living on Lake street.

Shortly before appellee went to live on Congress street, Frank Schunemann, who was in the coal business and subsequently married her niece, went to appellee's father's home in regard to coal, and says that appellee introduced appellant to witness as her husband; that witness talked with appellant with regard to coal, and appellant said, "After we get settled we may want some coal also, and if you treat us right we shall patronize you—just as soon as we get settled; we were recently married. I shall need wood and coal, and we shall probably give you a call provided you treat us right."

He further testified that later on he did receive an order from Mr. Hutchinson for wood and coal, and during 1875 and the following years, as witness thinks, to 1882, he took coal to 286 West Congress street quite a number of times; that sometimes he saw Mr. Hutchinson there, probably lying

on the lounge asleep; sometimes he would be up.   He also produced his books of account, which during the year 1881 at different times, showed charges of coal and credits of cash under the heading of " Hutchinson, 286 Congress street."   The witness' books prior to 1881 had been destroyed by fire.   He also saw Mr. Hutchinson at 365 Lake street, when he visited the Hutchinson family there.   He testified on cross-examination, that when he was introduced to Mr. Hutchinson that was the first time witness ever met him; that he knew appellee and her parents before that time, and knew that she had had a child, Jennie, whose father he heard was Mr. Hutchinson, though he didn't know, at the time of the introduction, whether she was a married woman or not.   He also says that sometimes other children called this child Jennie Curtis, but she was known as Jennie Hutchinson more.   This child, Jennie, was known and registered in one school that she attended as Jennie Curtis, and in another school she was registered as Jennie Hutchinson.   She testified in this case, having been married, under the name of Jennie Schutte, and explains in her evidence that she reported to her mother that she was called Jennie Curtis in school; that her mother said it was a mistake, and just as soon as she was able she would have it changed. She also says she was registered at the Skinner school in Chicago as late as 1883 or 1884 under the name of Jennie Curtis, and that it was prior to that time in the Carpenter school, that she was registered as Jennie Hutchinson.

Mrs. Emily Southwell, who knew the Hutchinsons when they resided on Congress street, and who visited them there a number of times, testifies in substance that one night she was sleeping with Mrs. Hutchinson when Mr. Hutchinson came home when he was not expected, and that witness had to go into another room and sleep with the children; that she was not there at meal time, but saw Mr. Hutchinson there in the day time.

Priscilla Baldwin, who was a roomer at appellee's house when she lived on Lake street, says she first met Mr. Hutchinson there; that he came to her door, which was the front

room of the house, on one occasion, and asked for Mrs. Hutchinson; that witness replied, " She is not in, I believe. * * * Did you wish to see her? He said, " Yes, she is my wife." This witness testified that on another occasion when she was at a meal with Mr. and Mrs. Hutchinson and the children, " I picked up one of the children and I said to Mr. Hutchinson, ' You have very lovely children and a good wife;' and he said ' I have a good wife.'" Q. " Go ahead." A. " Very lovely children." She also says that she lived in the family most of the time for three years, and during that time Mr. Hutchinson came and went at intervals; that " he came and went from the house as any man does at home." Also that she was introduced by appellee to Mr. Hutchinson as appellee's husband; that appellee used the words, " My husband."

The witness Charles M. Miller, who was in Mr. Hutchinson's employ from 1886 to 1898, and also in the employ of his brother, George C. Hutchinson, the two being partners, with his wife, conveyed, in the year 1890, certain real estate by warranty deed as a security to appellant, in order to get money to build upon it, and took an agreement from appellant to reconvey the property on repayment of the money and interest. Miller testified that he was told in 1896 by George C. Hutchinson, who died some two years before the trial, that appellant had a wife and four children, and that a few days thereafter witness spoke to appellant about it, saying, " George tells me you are married and have a wife and four children;" and that appellant answered and was surprised at the statement witness made. He answered and said, " Well I have—what of it? What is it to you?" " I said, ' It is a good deal to me, for it involves the title to the property which you hold;' the property in which I lived." The witness was thereafter discharged because of complaints made against him, which he says appellant told witness he could not suppress. It appears in the record, from letters written by Miller to Hutchinson and by Hutchinson to Miller during July and August, 1898, that there were differences between them on account of money mat-

ters; that Miller was advised by his attorney, whom he had consulted with reference to the title of his property which was held by appellant, that appellant could not, without his wife's signature, make a good title on a reconveyance of Miller's property to him. From this correspondence it appears that Miller suggested a sale of the property to appellant, and that unless the matter was settled in that way or appellant would procure a conveyance signed by his wife (meaning appellee), the matter would have to be settled by court proceedings.

On one occasion, after appellant had deserted appellee, when she and her daughter Jennie saw appellant walking on Washington boulevard, Chicago, with two young women, appellee reproached appellant for his conduct, and created a scene in the street, whereupon appellant left the women and walked home with appellee and their daughter. Only appellant, appellee and their daughter Jennie testify to this occurrence, and while they differ as to just what was said and done, it is apparent from their testimony that quite a disturbance in the street was created by appellee, because she found him in company with the two women, and in order to quiet her (and this he admits), he left them and walked home with appellee and their daughter. Appellee's conduct and language on this occasion, while violent and boisterous, might naturally be expected from an uneducated woman of the humbler walks of life, such as she was, who felt herself a deeply wronged and outraged wife by reason of her husband's treatment of her and their children, and his conduct. His action, according to his own account, was that of a husband who had committed a gross impropriety, and did not dare to defend himself against the indignant outbursts of his wife; it was not the conduct of a man toward his discarded mistress when she finds him associating with other women and publicly reproaches him.

Appellant freely admits his illicit relations with appellee prior to 1875, and says they were continued from that year, with slight intervals, until 1884 or later. He does not remember definitely when they ceased, but he denies that

he ever promised to marry her at any time, and denies that he ever made any contract of marriage with her, as she testified; also that he paid her money for the rent of the different houses in which appellee lived, or that he supported her, or that he lived with her and their children on Congress or Lake streets; also that he ever introduced her as his wife, or that she ever introduced him to Mrs. Baldwin or to Schunemann as her husband, or that he ever had the conversations testified to by these witnesses, or bought coal from Schunemann for use on Congress street, or that he had the conversation with Miller testified to by the latter, or that he was ever present at the birth of any of the children, or that he ever sent or requested his stepmother to go to appellee when she was about to be confined, or after she was confined. While appellant denies that he lived with appellee and their children on Congress or Lake street, he admits that he was there on an average, at night, once every two weeks. He also says that he was never there two consecutive nights, but lived at his father's home, his brother's, or boarded with a Mrs. Otten. The witnesses called by appellant on this point fail to corroborate him as to the times he lived at the different places where he said he lived.

Appellant admits that while appellee lived on Lake street he knew that she went by his name, the name of Hutchinson, and that he did not remonstrate with her for so doing. He says, however, that he didn't know that while appellee lived on Congress street she went by the name of Hutchinson, though there is abundant evidence in the record that she did. Appellant called a number of witnesses who were neighbors of appellee while she lived on Congress street, who testified that they did not see appellant go there during that period, and some of them say that they knew appellee by the name of Curtis, and heard her called by that name during that time. It is, however, a very significant fact that appellant called as his witnesses Annie Needham, who knew appellee twenty-three years, six or seven of which she lived in the same house with her, and the

latter was in the habit of taking care of witness' children, and knew appellee's father; also Caroline Landis, who knew appellee more or less for thirty-three years, and worked for appellant's parents before appellee did, knew appellee when she lived on Lake street, and is the same person as Mrs. Otten, with whom appellant says he boarded during part of the time appellee lived on Congress street; also Douglas W. Hutchinson, appellant's brother, who knew appellee, and first met her in 1875, at his father's house; also the wife of Douglas W. Hutchinson, who had met appellee's daughter, but not appellee; yet not one of these witnesses was asked by what name they knew appellee. It seems very strange that all of these witnesses should have been ignorant on this point. The last-named witness was not asked by what name she knew appellee's daughter. The first three of these witnesses must have known by what name appellee went, and whether or not she was reputed to be a married woman, and who was her reputed husband, if she had one. Winifred O'Connor, who was called by appellant, lived at 282 West Congress street, and was only slightly acquainted with appellee; knew her as Mrs. Hutchinson, because the latter told her so. Mary E. Tiffany, a niece of appellant's stepmother, lived in the family of his parents from 1867 to 1880, and knew appellee from 1867. She testified, viz.:

"I saw the complainant at the house of Mrs. Hutchinson in 1883, late in the fall, at night. She came to the basement door and rang the bell. My aunt went to the door. My aunt was Mrs. Hutchinson. I was with her at that time. We came out of the dining room. I heard the conversation between Mrs. Hutchinson and the complainant here."

Q. "State what the conversation was." A. "She said, 'Good evening Jennie.'"

Q. "Who said that?" A. "My aunt."

Q. "She said 'Good evening, Jennie?'" A. "And she said, 'I am sorry to see you here again.' She felt she could do nothing for her. Then I didn't hear what was said, what Jennie said, but auntie said, 'Charlie will not listen to me, anything I say to him about you.' She said, 'If you would only have him marry me for my children.'"

Q.  " Who said that ? "   A.   " Jennie."
Q.  " That is the complainant here ? "   A.   " Yes, sir."
Q.  " Was that all the conversation ? "   A.   " Well, all that I remember.   I was living right there with the Hutchinsons at 381 Randolph street, at the time.   Charles G. Hutchinson was there at that time off and on."

This witness was, however, not asked by what name she knew appellee, nor was she asked anything as to the visits of appellee's children there, nor as to how they were treated by appellant's stepmother, nor as to whether the latter was called grandma by the children.   It seems strange that she was not interrogated on these matters.

As shown by appellee's receipt quoted in the statement, she received from appellant the sum of $4,100, which is stated to be in full of all demands she had against him by reason of past relations, or for any cause whatsoever.   Appellee, her daughter, Mrs. Schutte, appellant and Mr. Maher, his attorney at the time the receipt was signed, and one of his solicitors in the Circuit Court and this court, testified as to the circumstances leading up to and at the time of the payment of this money and the execution of the receipt, and what was said on the occasion.   It is in some respects conflicting, but when all taken together and considered with reference to appellee's need of money at the time, we think its only tendency is to show an admission by appellee that her previous relations with appellant were illicit.   We think appellee was induced to sign the receipt by her necessities, and to sign it in the name of Jennie Curtis, because she was told by Mr. Maher to sign her maiden name.   He does not deny that he so told her. At least such a holding can not be said to be manifestly against the evidence.   If she was the common law wife of appellant before she took this money and signed the receipt these facts did not sunder the marriage bond.   Her character, aside from her relations with appellant, appears to be above reproach, and appellant's morality, aside from these relations, has not been attacked, but we think it apparent from his evidence that he has little regard for the sanctity of the marriage relation, as well as for his chil-

dren born to him as the result of many years (as he insists) of illicit and clandestine association with appellee. The evidence of such a man, to receive full credit, where his money interests are so vitally involved as here, needs the strongest corroboration.

The argument is advanced that appellee's claim should be discredited because she delayed fourteen years after she was deserted before filing her bill, and until after the death of appellant's parents and brother, by whom he might have defeated her. We think the argument is without weight. His stepmother, if she allowed the children to call her grandma, treated them as grandchildren, and attended, by his request, at the birth of one of them, would probably tell these facts when sworn as a witness. If Miller told the truth, and we think he did, then the testimony of appellant's brother George, if living, would probably be to the same effect. If his father were alive, there is nothing in the record to indicate that he knew anything which could be of any marked assistance to appellant. But it is needless to speculate on what these persons could testify to were they living. The case must be determined by what is before us.

There are numerous other facts and circumstances shown by the evidence besides those referred to, tending to support or defeat the respective claims of appellant and appellee, and tending to strengthen or throw discredit upon the testimony of different witnesses on both sides, but we do not deem them of sufficient importance to require special mention. We have considered the evidence carefully in the light of the able and exhaustive arguments, both printed and oral, of appellant's counsel, and are of opinion we should not disturb the decree, because we are unable to say that it is clearly and manifestly against the evidence.

If there was a contract of marriage, as testified to by appellee, and we think the preponderance of the evidence corroborates her in this respect, then the decree of the learned chancellor is correct. Port v. Port, 70 Ill. 484; Elzas v. Elzas, 171 Ill. 632; Laurence v. Laurence, 164 Ill. 370; McKenna v. McKenna, 180 Ill. 577, and cases cited; Maher v. Maher, 183 Ill. 61.

Hutchinson v. Hutchinson.

In the Laurence case, *supra*, the court, while holding that the evidence was not sufficient to sustain a common law marriage, say :

" It is impossible to fix a standard by which the evidence of a marriage in every case should be measured. Each case must depend upon its own facts and attending circumstances. Those circumstances or shadows which usually attend the lives of those who have assumed the marriage relation, are important in determining the question of whether a marriage does or does not exist. The conduct and bearing of the parties are regarded by their friends and relatives and by those with whom they associate. Introducing each other as husband and wife and holding each other out to the world as such, are circumstances of more or less weight, as they have relation to the length of time the parties have lived together, and the like. These are circumstances or shadows which we know, by observation, almost universally attend the married state and are always expected to attend it, and their presence or absence is highly important in determining whether a marriage without a ceremony has been entered into. To ignore them would open the door to fraud and imposition, invite perjury, threaten the legitimacy of children and the rights of heirs, and endanger the social fabric, which rests on the institution of marriage. Marriage will sometimes be presumed from cohabitation."

In the Elzas case, *supra*, in which the marriage contract closely resembles that in the case at bar, and though denied by the husband, it was corroborated by his admissions afterward made to the wife's sister, and by his letters, which by their tone indicated that the marriage relation existed, the marriage was sustained. The court say :

" When parties come together and agree by a present contract to accept each other as husband and wife, and enter into the marriage relation, such a contract will be valid and lawful, although not solemnized according to the provisions of the statute. The relation between the parties is always a matter of evidence and may be proved by records or any other evidence sufficient to establish the fact; and if it is shown parties intending marriage have accepted each other as husband and wife, the contract will be enforced." (Citing the Port case, *supra*.)

In the McKenna case, *supra*, the decision in the Elzas case

is re-affirmed, as is also what was said in the Laurence case, *supra*, though it was held that upon the woman's testimony itself it was insufficient to show " such mutual present consent to take each other as husband and wife as is essential to constitute a common law marriage."

In the Maher case, *supra*, the latest to which our attention has been directed, it was held (citing several previous decisions of the court) that it was sufficient to constitute a marriage legal at common law, that the contract and consent be *per verba de presenti*, and the court, in speaking of cohabitation and repute, among other things say :

" A presumption of marriage increases with the lapse of time the parties cohabit as husband and wife."

The marriage, however, was not sustained, because the woman abandoned the man, resumed her maiden name, did not look to him for support or hold any communication with him, and he afterward contracted another marriage.

As was said in the Laurence case, *supra*, " each case must depend upon its own facts and circumstances."

The chancellor saw and heard the evidence of all the witnesses, and was consequently in a far better position to judge of their relative credibility than a court of review. We should not disturb the decree unless we could say, upon the whole evidence considered, in view of the fact that we neither saw nor heard the witnesses when they testified, that it is clearly and palpably wrong.  Johnson v. Johnson, 125 Ill. 511, and cases cited; Kinnah v. Kinnah, 184 Ill. 284; Biggerstaff v. Biggerstaff, 180 Ill. 407; Village of Itasca v. Schroeder, 182 Ill. 192, 212.

This we can not say, and the decree is therefore affirmed.