CHARLES G. HUTCHINSON *et al.* Appellees, *vs.* DOUGLAS
W. HUTCHINSON *et al.* Appellants.

*Opinion filed April 19, 1911—Rehearing denied June 7, 1911.*

1. PLEADING—*when probate of will is sufficiently averred.* A
bill to contest a will which alleges that the instrument was ex-
hibited in the probate court for probate "and an order was therein
entered granting probate of the same," sufficiently alleges that the
will was probated, even though the bill contains an allegation that
the evidence was not heard in open court or by a judge of the
court, as it is the existence, only, of the order which is material
in a proceeding to contest the will.

2. SAME—*effect where an order allowing amendment and one
allowing withdrawal are made at same term.* Where an order al-
lowing an amendment to a bill to contest a will by striking out all
reference to the order of probate and a subsequent order permit-
ting the withdrawal of the amendment are made at the same term
they are treated as having been made at the same time, and the
court does not lose jurisdiction of the bill by reason of the amend-
ment having been made.

3. RES JUDICATA—*separate maintenance decree is binding in a
proceeding to contest defendant's will.* A separate maintenance
decree establishing a common law marriage between the complain-
ant and defendant, which has been affirmed by the Supreme Court,
is conclusive of the fact of such marriage in a subsequent pro-
ceeding to contest the defendant's will.

4. WILLS—*children are not the sole objects of father's bounty.*
Children are the natural objects of their father's bounty but not
the only natural objects if he has other relatives, and the fact that
his status as a father is fixed by a decree establishing a common
law marriage does not deprive him of the right to dispose of his
property by will to the exclusion of his children, if he sees fit.

5. SAME—*issue of undue influence, unsupported by evidence, is
properly withdrawn from jury.* An issue of undue influence in a
will contest case is properly withdrawn from the jury by the court
where there is no evidence having any tendency to show that the
will was procured by the influence of the defendants, or either of
them, or that they had anything to do with its execution or any
knowledge thereof.

6. SAME—*what is not evidence of an insane delusion.* The fact
that the testator, after a separate maintenance decree establishing
the existence of a common law marriage between him and a cer-
tain woman against his sworn testimony, adheres stubbornly to his

belief in the facts and refuses to admit the correctness of the decree though recognizing it as binding upon him, is not evidence of an insane delusion.

7. SAME—*an erroneous belief does not constitute insane delusion.* A belief which a rational person may entertain, however erroneous, is not an insane delusion, and it is reversible error to give instructions authorizing the jury to find a testator insane merely because he disagreed with a decree of court, entered against his sworn testimony, finding that a certain woman was his common law wife.

VICKERS, C. J., and FARMER, J., specially concurring.
HAND, J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

EDDY, HALEY & WETTEN, and JOHN T. MURRAY, (CHARLES H. PEGLER, of counsel,) for appellants.

FRED A. BANGS, (GROVER C. NEIMEYER, of counsel,) for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

Charles G. Hutchinson died on February 26, 1907, and an instrument executed on May 24, 1905, and purporting to be his will, was admitted to probate on April 12, 1907. A proceeding begun by his heirs in the circuit court of Cook county to set aside this probate was prosecuted to a decree granting the relief sought, and the executor and principal devisees have appealed.

The grounds alleged for the contest were the mental incapacity of the testator and undue influence exerted upon him to procure the execution of the will. The latter ground was withdrawn by the court from the consideration of the jury. Cross-errors have been assigned upon the record by the appellee and various questions have been argued by counsel for the respective parties, not all of which will require our determination.

A preliminary question arises upon the . action of the court in denying the appellants' motion to dismiss the suit for want of jurisdiction. This motion was based on the claim that the original bill did not aver that the alleged will had ever been admitted to probate. This claim is an error, because the bill did aver that the instrument was exhibited in the probate court for probate "and an order was therein entered granting probate of the same." The subsequent allegations that the evidence was not heard in open court or by the judge of the court are immaterial. It is the existence of the order admitting the instrument to probate which is material. It is that order which is sought to be set aside. Whether it was properly entered upon the showing made, or was based upon evidence which was competent or incompetent, sufficient or insufficient, or upon any evidence whatever, is not the subject of inquiry in this proceeding. On April 29, 1908, after a special demurrer had been sustained to the bill, and more than a year after the probate of the instrument, appellees amended it by striking out the paragraph referring to the probate. This was a manifest inadvertence, and on May 6, at the same term, the appellees, by leave of the court, withdrew this amendment, leaving the bill as originally filed. Later the bill was amended by striking out the allegations of the bill to the effect that the evidence had not been taken in open court or by the judge of the court. It is insisted that the amendment of April 29, striking out all reference to the probate of the will, deprived the court of jurisdiction of the cause of action, and that the time within which the court could acquire jurisdiction having elapsed, the amendment of May 6 could not restore such jurisdiction. Whatever force this proposition might have if the term had elapsed, (and this we do not determine,) it has none in this instance. The term of court is regarded as a single day, to which all the proceedings of the term have reference. The order allowing the amendment and that allowing its withdrawal being

made at the same term are to be regarded as made at the same time and did not affect the jurisdiction of the court.

The decedent left four children, the appellees, Charles G. Hutchinson, Jennie C. Schutte, Daisy Grace Hutchinson and Violet Hutchinson, as his only heirs, and their mother, Jennie Curtis Hutchinson, his widow. His marriage was not ceremonial and in 1884 he deserted his wife and children. In 1898 he was sued by his wife for separate maintenance, and he denied that he was ever married to her. The cause was strenuously contested and resulted in a decree in favor of the wife, which was affirmed by the Appellate Court and by this court. (*Hutchinson* v. *Hutchinson,* 96 Ill. App. 52; 196 Ill. 432.) That decree established the marriage and is conclusive here. (1 Greenleaf on Evidence, sec. 525; *Burlen* v. *Shannon,* 3 Gray, 387.) After the decree the decedent continued to deny the existence of the marriage and never recognized his wife as bearing that relation to him, except in so far as the existence of the decree made such recognition compulsory. He lived as an unmarried man with one or another of his brothers, who are the chief beneficiaries under his will. He left an estate of several hundred thousand dollars. By his will he gave legacies of $5000 each to Mary E. Tiffany and Josie Tobin and of $2000 each to his daughters Grace and Violet. All the rest of his estate after the payment of his debts was devised to his three brothers, William A. Hutchinson, Chester M. Hutchinson and Douglas W. Hutchinson, the latter of whom was nominated as executor without bond. The devise to his two daughters and the only reference to his wife or children in the will are found in the second and third clauses, which are as follows:

"*Second*—Whilst the courts of the State of Illinois have decreed that one Jennie C. Hutchinson, who was always known to me as Jennie C. Curtis, is my common law wife, I know that in truth and in fact she is not and that no such common law marriage took place as was testified

to by her on the trial of the case of Jennie C. Hutchinson *vs.* Charles G. Hutchinson; and it is my express will that she shall have no share whatsoever in any of my estate other than that which she may obtain under and by virtue of the laws of the State of Illinois, and any of my property which may come to her after my death she will obtain solely because the laws of the State of Illinois give such property to her and not because I desire that she shall have the same.

"*Third*—I give and bequeath to the two youngest daughters of the said Jennie C. Hutchinson, namely, Grace Hutchinson and Violet Hutchinson, the sum of two thousand dollars ($2000) each."

Appellees by the assignment of cross-errors have questioned the action of the court in withdrawing from the jury the issue of undue influence. This action was right. There is no evidence in the record which has any tendency to show that the execution of the instrument in question was procured by the undue influence of the appellants, or either of them, or that either of them had anything to do with or knowledge of its execution. At the time of its execution, May 24, 1905, James Maher, who had been Charles G. Hutchinson's attorney for a number of years, represented him in litigation which was then pending and had occasion to go to see him frequently at William A. Hutchinson's house, where testator was then living, about this litigation and his other business. At one of these times testator talked with Mr. Maher about writing his will and gave directions for that purpose. At his request Mr. Maher prepared a draft of the will, which was submitted to him, and afterward another draft, or more than one. The instructions in regard to the will came entirely from Charles G. Hutchinson. Nobody else made any suggestions or spoke to Mr. Maher about it or was present at any of his conferences with the testator. It was executed in the presence of Mr. Maher and two others who were asked by testator to sign it

as witnesses, and no other person was present, though Earl Dunning, who was an attendant upon the testator, was in the next room. There is no evidence that any suggestion was made to the testator by any of the appellants or any other person that he should make this will or any will. In 1899 and in 1900 the testator had made two wills, in each of which a substantially similar disposition of his estate was made to substantially the same persons, differing only in minor details. There is no indication that at the time of the execution of any of these wills the testator was under any sort of restraint or influence aside from his own wishes, or that he acted in any manner otherwise than as an entirely free agent.

Much testimony was introduced at the trial on the question of the testator's mental capacity. He was sixty years old when he died and the testimony covered more than forty years of his life. In 1865 or 1866 he came home from college in the east, and from that time for many years was employed in his father's bottling works in Chicago as a foreman and a book-keeper. About 1867 he began to have illicit relations with Jennie Curtis, which continued until 1875, when they were united by a common law marriage. The extent to which they openly lived together thereafter is uncertain, though three children were afterward born to them. They never lived together after 1884. He invented a stopper for bottles, which was patented in 1879. Soon after he organized a corporation in conjunction with his brother George and was actively engaged in the management of its business for many years. He was successful in business and accumulated a large amount of property. He had gonorrhea when he was about twenty years old and syphilis about twenty years before his death. He had a slight stroke of an apoplectic nature in 1895, which rendered him unconscious and partially paralyzed. He gradually recovered from this, though he did not fully recover the use of his hands and wrists, his limbs

remained stiff and his feet dragged. His eyes were crossed and for a time he saw double, but these troubles were afterward cured. He suffered a second and much more severe stroke of the same character in 1899. He experienced some loss of feeling in his body, arms and legs, loss of control of his legs, of his bladder and of his bowels, was weak in his hips, knees and ankles and could not readily lift his legs and advance them. The muscles about his shoulders and arms were wasted and the nerves degenerated. There is unanimity among the medical witnesses who testified on the subject that the cause of the trouble was syphilis. By some it is called syphilis of the brain and spine, by others sclerosis, arterial sclerosis, multiple sclerosis, post-lateral sclerosis, paralysis or paresis. Though stiff and uncertain, the testator did not lose his power of locomotion until confined to his bed shortly before his death. There is no contradiction as to the testator's physical condition. As a result of syphilis there was a degenerated condition of the spinal cord and of the posterior portion of the brain, and this condition was incurable.

Many witnesses, medical and non-medical, were examined whose knowledge of the testator covered the last forty years of his life. A very large majority of them expressed the opinion that he was of sound mind. The testimony of expert medical witnesses was also introduced by each party, whose opinions, given in answer to hypothetical questions, tended to support the views of the respective parties calling them. It is insisted by the appellees that the testator was afflicted with paresis,—a progressive disease, manifesting itself at first, perhaps, by a slight loss of memory, dropping of words or carelessness as to dress and person, these conditions becoming more marked as the disease progresses and affecting in an increasing degree the memory, judgment and mental functions, until, in an advanced stage of the disease, the mental powers of the victim are wholly destroyed. Syphilis is the principal, if not the sole, cause of paresis.

There is no evidence that the testator was of unsound mind prior to December, 1902. The fact that he was afflicted with syphilis and the extent to which the disease had progressed indicated that there was occasion to fear mental impairment in the future but not that such impairment then existed. At that time the testator went to Palmyra, Wisconsin, where he entered the Palmyra Springs Sanitarium as a patient. He remained there about three months, and during a part of that time he was delirious and irrational and was subject to frequent illusions and hallucinations. The evidence is conflicting as to whether this condition was caused by drugs administered to him or was due to another cause. The will in question was not executed until more than two years after the testator left the sanitarium, and in the meantime there had been no recurrence of the illusions or hallucinations. Since the decree must be reversed for error occurring on the trial, we shall not discuss the evidence or state it in detail or express any opinion as to its weight.

The appellees insisted on the trial, and argue here most earnestly, that the testator did not recognize his children as objects of his bounty and was therefore not of sound mind. It is insisted that he was under the insane delusion that he was not married to his wife and that the appellees were not his legitimate children. The jury were instructed that the decree in the separate maintenance case conclusively established that the testator was married to Jennie C. Hutchinson and that four children were born to them, and that if the jury found that the complainants were the children of the testator they would also find that they were natural objects of his bounty and affection. Thereupon the complainants requested, and the court gave also, the following instructions:

"The court instructs the jury that if you believe, from the evidence, that the complainants are the children and heirs of Charles G. Hutchinson, deceased, and that said

Charles G. Hutchinson, deceased, after August 8, 1900, and before May 25, 1905, stated that he was a single man, and during such time would not admit to his solicitor that the complainants were his children but denied that they were his children, and then told his solicitor, in substance, that he did not want them to ever get anything more than he allowed them in his will; and if the jury shall find, from the evidence, that the deceased, Charles G. Hutchinson, was prior to August 8, 1900, married, and that he knew on said date that he was married and that the complainants were his children and by him acknowledged as his children; and if the jury shall further believe, from the evidence, that some time between August 8, 1900, and May 24, 1905, Charles G. Hutchinson, deceased, thought and believed, without any cause or reason, that he was a single man and that the complainants, or any of them, were not his children, and that such belief would not and did not and could not yield to evidence or reason, and if they further believe, from the evidence, that said Charles G. Hutchinson, deceased, was governed and controlled by that belief, and that such belief was operating upon the mind of said Charles G. Hutchinson, deceased, at the time of the signing of the writing in evidence purporting to be the last will and testament of Charles G. Hutchinson, deceased, bearing date May 24, 1905, then the jury are instructed that they shall find that the writing in evidence purporting to be the last will and testament of Charles G. Hutchinson, deceased, bearing date May 24, 1905, is not the last will and testament of Charles G. Hutchinson, deceased."

"The court instructs the jury that if you believe, from the evidence, that complainants are the children and heirs of Charles G. Hutchinson, deceased, and that said Charles G. Hutchinson, deceased, after August 8, 1900, believed that he was a single man, and that such belief, if any, would not, did not and could not yield to evidence or reason, and that such belief caused the said Charles G. Hutchinson, at

the time of signing the paper purporting to be the will of
May 24, 1905, to believe that the complainants, or any of
them, were not his children, and that such belief as to his
children, if any, had no other foundation whatsoever, then
the jury shall find that the paper purporting to be the last
will of Charles G. Hutchinson, deceased, dated May 24,
1905, is not his will."

These instructions required the jury to find against the
validity of the will if they believed, from the evidence, that
the testator, after August 8, 1900, believed, without any
cause or reason, that he was a single man and that the
complainants, or any of them, were not his children, and
that such belief would not yield to evidence or reason but
was operating upon his mind at the time of the signing of
the supposed will. They are based upon the supposed ex-
istence of an insane delusion of the testator as to his mar-
riage and his children and they do not have a sufficient
basis in the evidence. The question of what constitutes an
insane delusion rendering one incapable of making a will
was considered by this court in the case of *Owen* v. *Crum-
baugh,* 228 Ill. 380, and a number of definitions by various
courts are there cited. In whatever words such definition
may be expressed, a belief which a rational person may en-
tertain, however erroneous, does not constitute an insane
delusion. There is no basis in the evidence for contending
that the testator was under a delusion as to any fact, except
during the times of his temporary delirium at the Palmyra
Springs Sanitarium. He knew that on August 8, 1900, a
decree had been rendered declaring Jennie C. Hutchinson
to be his wife and that four children were born of his
marriage to her. He knew that the appellees were those
children, and that in law Jennie C. Hutchinson was his wife
and the appellees were his children. There is no evidence
that he ever had any doubt of these things as matters of
fact. The will itself recognizes the decree establishing the

status of his wife. He knew that in law she was entitled
to, and would receive, the share of his estate given to a
surviving wife by the laws of Illinois and that he could not
prevent it. His legal obligation was the same as that of
any other man to his wife and children. He had the legal
right to dispose of his property to other persons than his
children if he saw fit. They were natural objects of his
bounty, though not the only natural objects thereof. His
brothers were also natural objects of his bounty, and among
them all the testator had the right to choose what claims
he would recognize as most worthy. The will shows that
he recognized the claims of two of his children. Under
normal family relations he would naturally have provided
for all his children with greater liberality. But his family
relations were not normal, and the fact that he did not
make his children the sole objects of his bounty, or the
chief objects, does not tend to justify the conclusion that
he was insane. He deserted his family in 1884. In 1898,
when sued by his wife for separate maintenance, he denied
the marriage, and it was only against his most determined
opposition that it was established and against his testimony
as a witness in denial of the facts constituting the marriage.
The decree, and its affirmance by the appellate tribunals,
did not, and could not be expected to, change his attitude
towards the facts in the case. He had denied under oath
the facts on which the decree was based, and while the
force of the law compelled him to submit to the decree,
it did not and could not compel him to change his belief
as to the facts or his declaration as to his belief. The
natural effect of the litigation might have been to include
the children in the bitter hostility to the mother. During
the pendency of that suit the testator made a will not ma-
terially different from the one now in controversy, and im-
mediately after the decree another very similar. The evi-
dence tends to show from the first an earnest design to

shake off absolutely, so far as possible, the claim of his wife and of her children, first by repudiating the marriage, if possible, and if not, then by disposing of his property away from them, and that he never departed from this intention but strictly adhered to it to the end. There was no change in his attitude toward his wife and children on or after August 8, 1900. The decree entered on that day made no difference in his mental attitude or mental condition. The fact that he adhered stubbornly to his belief in the facts after the court had found them against his sworn testimony was no evidence of an insane delusion. It is not evidence of insanity to disagree with the judgment of a court. The hypothesis contained in these instructions, that Charles G. Hutchinson believed, after August 8, 1900, that he was a single man and that the complainants, or any of them, were not his children, and that this belief would not and did not and could not yield to reason, has no foundation in the evidence. The instructions were misleading and it was error to give them.

The decree is reversed and the cause remanded.

*Reversed and remanded.*

VICKERS, C. J. and FARMER, J., specially concurring: We concur in the reversal of the decree below for the reason stated in the opinion of Mr. Justice Dunn, but in our opinion the evidence is wholly insufficient to sustain the verdict of the jury, and we think that the decree should be reversed upon this additional ground.

Mr. JUSTICE HAND, dissenting: In my opinion there is sufficient evidence in the record to sustain the decree and upon which to base the instructions referred to in the majority opinion, and I think the decree should be affirmed.