No. 37,534

In the Matter of the Estate of Cyrus E. Millar, Deceased (BILLY
MILLAR PYLE and LOIS ALLEN, *Appellants*, v. CARRIE E. MILLAR,
as an Individual and as Executrix of the Estate of Cyrus E. Mil-
lar, Deceased, *Appellee*).

(207 P. 2d 483)

Opinion filed June 11, 1949.

*John A. Etling,* of Kinsley, argued the cause, and *C. H. Morris, Lee Garrett,*
both of Wichita, and *W. N. Beezley,* of Kinsley, were with him on the briefs
for the appellants.

*George Barrett,* of Pratt, argued the cause, and *Dwight H. Moore,* of
Greensburg, was with him on the briefs for the appellee.

The opinion of the court was delivered by

ARN, J.: February 26, 1947, Cyrus E. Millar departed this life,
and on April 9, 1947, his last will and testament (made and exe-
cuted May 5, 1945) was admitted to probate in the probate court
of Kiowa county. Decedent left no surviving spouse and left sur-
viving him no child or children except his two daughters who are

the appellants here. No appearance was made in the probate court by these appellants, but in due time they perfected an appeal to the district court where they filed written defenses to the petition for probate and prayed that the probate court's order admitting decedent's will to probate be set aside. The trial was by the court which sustained the validity of the will, and the findings were recorded as follows:

"THE COURT: Well, gentlemen, I have listened to all this argument and have heard this testimony, and I find there is no general incompetency here at all, and I don't believe there was any lack of mental capacity. I do not believe there was a delusion. I think he might have had the wrong idea or opinion as to the fidelity of these children, but I think that was his belief, because in the divorce case they had sided in with the mother. And I find there was no undue influence such as is contemplated by the law and would be required to set aside this will.

"Your argument was masterful. You brought up everything that I think could be brought up, but I still think you would have to go on suspicion and surmise in order to find undue influence.

"COUNSEL: May I make this inquiry: Is it the position of the Court that notwithstanding the fact that the several circumstances upon which we have relied here are undisputed that it is largely a matter of insufficiency of proof under the law?

"THE COURT: Well, I would say that, yes."

A motion for new trial was overruled, and from the court's judgment and decree sustaining the will, the two daughters have appealed.

Appellants contend the undisputed evidence before the trial court showed: (1) That at the time of the execution of the purported will, Cyrus E. Millar was mentally incompetent in that he was the victim of an insane delusion which caused him to believe the appellants had sided with their mother in a divorce case instituted by her a few days before, and that such delusion directly influenced the terms of the will; (2) that the will was the result of undue influence exercised upon decedent by his mother and principal beneficiary, Carrie E. Millar, sufficient to make it her will rather than the will of the decedent.

The evidence disclosed quite clearly that the testator Cyrus Millar frequently (perhaps habitually) imbibed to excess of spirits frumenti. The exact dates of the occurrences are not clear, but for some years before he undertook to make his will, he did at times have imaginative delusions, or hallucinations, of being a linguist versed in several foreign languages, a gunman, and a knife thrower.

On one occasion he believed a colored-glass window was his wife frozen in ice. On May 1, 1945, he became so intoxicated he "passed out" on the living room floor of his home. There was also evidence that Cyrus' mother and principal beneficiary under his will had a dislike for his wife and two daughters. On May 1, 1945, Mrs. Millar instituted divorce proceedings against Cyrus and on May 3 Cyrus went to live with his mother in Pratt, where he stayed until about May 20. One witness testified Cyrus had said he was afraid of his mother. On May 2 the mother requested of Cyrus' attorney that her personal attorney be associated with him as co-counsel for Cyrus, and some time later she wrote to Cyrus' attorney stating that Cyrus had asked her to notify him that he was discharged as counsel for Cyrus. On May 3, 1945, the mother's physician attended Cyrus and said he looked as though he had been intoxicated for some time, but his mental faculties were good. On May 5, Cyrus was improved but still nauseated. The physician treated Cyrus until May 17, 1945. The will was executed on May 5 in Cyrus' bedroom upstairs in his mother's home. The mother was not present. Cyrus' mother or the scrivener of the will did not testify, but ten witnesses testified for the proponents of the will to the effect that Cyrus Millar knew the nature and extent of his property and the natural objects of his bounty; that he carried on rather extensive ranch operations and was competent to transact business; that he knew what he wanted to do with his property; and that he was competent to make a will. Several witnesses saw him on May 5 when the will was made and in their opinion Cyrus was on that day mentally competent although he looked bad. Two witnesses for the proponents of the will testified in effect that Cyrus told them his two daughters and his wife were trying to get his property and he hadn't left the two daughters anything (or they weren't to have a cent) because they wouldn't do what he wanted them to do—and because they had turned against him, *et cetera*. Two other of proponent's witnesses testified that on May 5 Cyrus did not appear to be under any restraint or influence. All witnesses said that Cyrus was good to his two daughters and that the daughters had been good to him; that they had seemed to be fond of each other, at least prior to the divorce. The girls had always helped Cyrus on the ranch. They helped round up and herd the cattle before they married, and one of them had acted as his secre-

tary. There was no evidence that the girls had "turned against" their father, but there was substantial evidence that he believed they had done so—or that they had "sided" with their mother in the divorce case. One witness for the opponents of the will, a physician, said he guessed Cyrus had the mental capacity to "go on with his business." Some ten or eleven of opponents' witnesses, including Cyrus' ex-wife and his two daughters, believed Cyrus was mentally incompetent. One physician, qualified as an expert in nervous and mental diseases, was of the opinion that Cyrus suffered from "mental delusions" as a result of chronic alcoholism; and that Cyrus'· belief that his daughters had turned against him was a delusion. Another witness for opponents of the will testified ·Cyrus had said his mother did not like his wife and daughters, and that Cyrus regretted he had willed the property to his mother and neglected his children. After the divorce action was filed, the court —with the consent of Cyrus' wife—directed Cyrus to have the sole management of the 10,750-acre ranch with 2,000 head of cattle and other property, worth in all approximately $300,000. There was some evidence that Cyrus had an investigator working for him while the divorce case was pending, who reported to Cyrus his findings regarding the wife and daughters. The evidence was conflicting as to whether Cyrus continued his drinking habits after May, 1945, but he lived until February 26, 1947, more than one year and nine months after making the will, when he met his death by reason of accident.

From the foregoing summary it is apparent that this is a fact case presenting questions to be determined by the trier of the facts. Perhaps upon the same testimony appearing in the record before us, had it been our prerogative to weigh the evidence, this court would have been impressed differently than was the trial court—and our consideration of the evidence might have resulted in different findings than those made by the trial court. But that is not the test. We cannot weigh conflicting evidence, and we must not disturb the findings of the trial court if there is substantial evidence to support them. (*Mann v. Staatz*, 156 Kan. 275, 133 P. 2d 103; *In re Estate of Pallister*, 159 Kan. 7, 152 P. 2d 61; *In re Estate of Walker*, 160 Kan. 461, 163 P. 2d 359; *In re Estate of Wittman*, 161 Kan. 398, 400, 168 P. 2d 541; and the many cases collected in Hatcher's Digest, Appeal and Error, §§ 503-508.)

It is appellants' contention that their evidence (offered as op-

ponents of the will) was uncontradicted and substantial to show (1) that the will was the direct result of an unfounded insane delusion of the testator, Cyrus Millar; and (2) that testator's mother and principal beneficiary under the will, Carrie Millar, exercised undue influence upon him.

What is an *insane delusion*? We have no difficulty in conceding that Cyrus Millar, at some uncertain time prior to May, 1945, and as a result of intoxication, suffered some abnormal condition when he believed himself to be a proficient linguist (there was no evidence of his proficiency in any foreign language), a knife thrower, a gunman, or when he thought a colored glass window was his wife frozen in ice, although from the distinction made by some authorities, it would appear that the inebriate who sees "pink elephants" and the like suffers from hallucinations rather than insane delusions. Many authorities, however, consider it too narrow a conception of the term "insane delusion" to say it is a belief in something that is impossible.

". . . the meaning of insane delusion, in its legal sense, is 'a belief in things impossible, or a belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credence.' . . . to avoid a will upon that ground the delusion must be an *insane delusion*, and that the will was the *product* of that delusion." (*Johnson v. Johnson,* 105 Md. 81, 85, 65 Atl. 918, 121 Am. St. Rep. 570.)

A belief does not amount to—

"An insane delusion, unless it appears that his belief was wholly without any basis whatever, and that the testator obstinately persisted in it against all argument which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion." (*Stull v. Stull,* 1 Neb. (Unof.) 389, 396, 96 N. W. 196.)

"An insane delusion is a belief in something impossible in the nature of things or impossible under the circumstances surrounding the afflicted individual, and which refuses to yield either to evidence or reason." (*Scott v. Scott,* 212 Ill. 597.)

There is no evidence in this record which tends to show that the deceased had any such delusion in regard to his children. The fact that testator's regard for his children was lessened by the fact that one of them had sympathized with and aided testator's wife in certain family difficulties constituted no indication that testator entertained an insane delusion against his children. (*Bauchens v. Davis,* 229 Ill. 557, 561, 82 N. E. 365.)

Another definition of the term is found in 68 C. J. 433, § 30:

"A delusion, to deprive the testator of capacity, must be an insane delusion. An insane delusion such as will affect testamentary capacity is an idea or belief which has no basis in fact or reason and to which the testator adheres against reason and evidence, or, in other words, it may be stated to be a belief in a state of facts that does not exist and which no rational person would believe to exist. A mere mistaken belief or an erroneous or unjust conclusion is not an insane delusion if there is some foundation in fact or some basis on which the mental operation of the testator may rest, even though the basis may be regarded by others as wholly insufficient. Similarly, even though the testator may be in error in his reasoning, undue or unnatural prejudice or aversion, if based on any kind of reasoning, is not an insane delusion; to prove it such it must appear that there was no basis for it and that attempts were made by reasoning to dispel it; if there is no basis for it, it is an insane delusion. One may have a delusion which does not imply or show unsoundness of mind, being merely evidence of insanity."

"Insane delusions" have been specifically contrasted with or distinguished from "delirium," "error," "hallucinations," "irresistible impulse," "mistake of fact," and "pessimistic beliefs." (44 C. J. S. 8.)

The distinction between a mistake and an insane delusion is that a mistake, whether of fact or law, moves from some external influence which is weighed by reason, however imperfectly; while a delusion arises from a morbid internal impulse having no basis in reason (*Taylor v. McClintock*, 87 Ark. 243, 112 S. W. 405); and a belief which a rational person may entertain, however erroneous, is not an insane delusion (*Hutchinson v. Hutchinson*, 250 Ill. 170, 95 N. E. 143).

The term "insane delusion" has been considered by this court in a number of cases. In *Medill v. Snyder*, 61 Kan. 15, 58 Pac. 962, a jury was called to aid the court and in addition to its special findings the trial court made findings of its own. This is another case where we refused to disturb the findings made by the trier of the facts where there was substantial evidence to support them. Concerning "insane delusions," we said in the Medill case:

". . . While the definition given may be found in the books, it is a too narrow conception of the term to say that it is a belief in something that is impossible. (citations) The things believed may not exist, and there may be no grounds whatever for the belief, and yet their existence may not be a physical impossibility. An instance cited is the persistent and wholly unfounded notion that a wife is guilty of adultery. Another example is where a parent, without the slightest pretense or color of reason, unjustly persists in attributing to a daughter a gross vice and uses her with uniform unkind-

ness. Another is where a person, without cause or reason, insists that those who had administered medicine to him in sickness had given him poison. These things are not physical impossibilities, but if such a belief is entertained against all evidence and probability and after argument to the contrary, it would afford grounds for inferring that the person entertaining it labored under an insane delusion. We think the instructions cannot be regarded as erroneous, and, since the court made its own findings of fact from the evidence, the instruction is not of great consequence." (l. c. 23-24.)

*Harbison v. Beets*, 84 Kan. 11, 113 Pac. 423, is another case involving an insane delusion, and there a jury was called to aid the court but the court made its own findings. In discussing the term, we said:

"There is a seeming conflict between these findings, but upon careful examination in the light of the evidence they are susceptible of reconciliation. That the testator fully understood and knew that he was placing the daughter's portion in the hands of trustees, to be used for her support as therein directed, is not necessarily inconsistent with the idea that he did not have sufficient mental capacity to comprehend what he was doing and how he was disposing of his property, in view of the further proposition that he did not have sufficient mental capacity to understand the ties of relationship and the claims of his various children upon him and that he was under an insane delusion as to an imaginary quarrel in the appellee's family and was influenced thereby in making the will, and that 'he was chiefly controlled by the thought that his daughter, Eliza J. Harbison, was in danger of being driven out of her family.' It all amounts to this: That he had mental capacity to know how he wanted the will drawn and to direct that the appellee's portion be placed in the hands of trustees, but not to transact business generally in a sane manner, on account of the insane delusion about the quarrel and the fear of the daughter's being thrown upon her own resources by her well-to-do husband. True, the specific insane delusion found relates only to the imaginary quarrel, but manifestly the court, as shown by the ninth and eleventh findings, thought this specific delusion merged into the notion that the appellee was in danger of financial desertion, and that the testator entertained such notion is abundantly shown by the evidence, and no basis therefor is apparent. In other words, the result may be thus epitomized: He knew what he was doing, but he had an insane reason for doing it. This is really not more mysterious than other manifestations of insanity, for its effects are often inconsistent and inscrutable.

"It is familiar law that one laboring under an insane delusion which influences him to make a will in a certain way does not possess testamentary capacity." (l. c. 17-18.)

The last sentence of the above quotation leaves no room for distinction between an insane delusion and testamentary incapacity. That would indicate any testimony that a person was mentally competent to make a will negatives the fact that he suffered an insane delusion. It should also be noted that in the Harbison case

the trial court found, upon substantial evidence, that the eighty-six-year-old testator suffered an insane delusion which influenced his will. It was another case where this court would not disturb a finding supported by substantial evidence.

In *Wisner v. Chandler*, 95 Kan. 36, 147 Pac. 849, the trial court found that the elderly testator at times suffered from "senile dementia," but the other findings were not sufficient to indicate incompetency to make a will, nor that testator's knowledge and comprehension of his property and business affairs were affected by the accompanying finding of "senile dementia." This court reversed the trial court, holding that the will should have been sustained upon the findings made by the trial court. In the opinion we said:

"The court found that Charles and his stepmother sometimes quarreled, and while their relations were not severed and remained cordial and ordinarily affectionate, he sometimes used to her and of her language profane, unkind, and in a few instances, cruel. This finding was supported by evidence of coarse and vulgar epithets applied to Mrs. Wisner and of a brutal defamation which Charles circulated, which wounded his father most deeply. Charles denied the defamation, but lack of proper respect for Mrs. Wisner extending to cruelty on the part of Charles was expressly found by the court. It was not a figment of the testator's imagination. It was not a delusion springing from a mind disordered by disease. It had a solid basis in reality. However much it may be regretted that the testator could not forgive, as Mrs. Wisner probably did, his resentment was human and natural, and if he magnified his injury and illogically and unjustly carried his resulting prejudice too far, so that it extended to the family over which Charles presided, he was not possessed of an insane delusion within the purview of any well-considered decision of which this court is aware." (l. c. 49.)

Fairly close in point is the case of *Akins v. Akins*, 109 Kan. 453, 199 Pac. 922, where testator was a constant and excessive user of intoxicating liquor. It was claimed the will was a result of an insane delusion. The findings of the trial court sustained the will, and so we have another case where this court refused to disturb the trier's findings supported by substantial evidence. Concerning insane delusions, we said there:

". . . The evidence tended almost conclusively to show that the plaintiff had not in any way wronged his father in the management of the business or in the sale of it, although in the sale there was that which would excite the suspicions of many men. Grant that John Akins was mistaken, a mistake is not an insane delusion. A mistaken belief entertained by one that he has been wronged by another is a very common frailty of humanity, but such belief is not necessarily an insane delusion." (l. c. 456.)

The fact that a person is frequently excessively intoxicated does

not necessarily mean he lacks testamentary capacity. In those situations the trier of the facts must appeal from the testator drunk to the testator sober.

Appellants cite *Sharp v. Losee,* 109 Kan. 211, 199 Pac. 94, where the testator was also a very elderly man although neither "senile dementia" nor "insane delusions" as such were discussed. The facts were highly controversial. A jury aided the court and the trial court made findings of fact of its own which were supported by substantial evidence—and this court would not disturb them.

*Fuller v. Williams,* 125 Kan. 154, 264 Pac. 77, concerned the purported will of a man who had been several times an inmate of an insane asylum and upon one occasion a commission which adjudged him insane found that he had permanent delusions of being persecuted. This court reversed the trial court upon several errors including a refusal to admit competent testimony. However, "insane delusions" were discussed in the opinion, thus:

". . . We shall not prolong this opinion by a statement of the evidence bearing on this question, but since the case is to be tried again, simply mention it as a question that should receive due consideration. The rules of law pertaining to such insane delusions are sufficiently discussed in former decisions of this court (citing cases) and other authorities readily accessible. It is familiar law that one laboring under an insane delusion which influences him to make a will in a certain way does not possess testamentary capacity." (l. c. 167.)

In *Steward v. Marker,* 143 Kan. 860, 57 P. 2d 75, the trial court sustained the will and made findings of fact. Again, this court refused to disturb those findings when it was determined there was substantial evidence to support them. The opponents of the will claimed testator suffered from an insane delusion and therefore did not have testamentary capacity. Reference was made to the rule stated in *Harbison v. Beets,* supra.

An exhaustive search does not bring to our attention any other cases where this court has considered the subject of "insane delusions"; but for a collection of the recent cases from other jurisdictions, and for an elaborate discussion of the subject as it pertains to the law of Wills, see the annotation in 175 A. L. R. 882-975.

From a careful study of the record before us, it appears that the testator probably was mistaken in his belief that his two daughters did not care for him or that they had turned against him. There was no positive evidence that they had done so and there was some evidence that they were fond of their father. But neither of the

daughters testified as to any love for their father at the time of the divorce action, nor did they attempt to negative his purported belief that they had sided with their mother. The trial court was of the opinion (according to the findings) that testator was mistaken in his belief, but found that he nevertheless did believe his two daughters had turned against him in the divorce case and sided with their mother. Testator may have known some facts that the witnesses did not know, which caused him to believe as the trial court found he did believe. The property disposed of by the will was his property, and while it seems somewhat incredible that a father would disinherit his two daughters, he had that right if he wished. Cyrus Millar knew he was making a will and said at the time of its execution that it was his will and he had read it. He told his banker in May, 1945, that he didn't want his daughters to have his money because they wouldn't do what he wanted them to do. The daughters did not deny having refused any request of their father. A witness of appellants testified that Cyrus Millar told him in the summer of 1946 that he regretted not having left his daughters anything—but that was several months before testator died. Perhaps a matter of some concern to the trial court in making the findings here was the fact that Cyrus Millar, after making the will on May 5, 1945, lived only some three weeks in the home of his mother and then lived elsewhere on his own until February 26, 1947, during which time (a year and nine months) he could have made a new will at any time.

However, it is not necessary to speculate upon the reasons behind the findings of the trial court that there was no delusion, as long as there is substantial evidence to support the findings. We conclude there is.

It is next contended by appellants that testator's mother and principal beneficiary under the will exercised undue influence upon him sufficient to make the instrument her will rather than that of decedent. Appellants argue that testator's physical condition while living in his mother's home provided an opportunity for the exercise of undue influence over him; that testator's mother had the ability and disposition to unduly influence testator; that she disliked his daughters and coveted his property. True, the evidence above narrated and included in the record before us does show that testator was in his mother's home about three weeks and that the will was executed on the third day of his presence there while recu-

perating from a severe drunk of a few days before. It shows further that testator's mother obtained a doctor for him and that she wrote a letter for him discharging an attorney who had previously represented him and who was replaced by an attorney who also represented the mother. One witness quoted Cyrus as saying his mother wanted the ranch, and another that he was afraid of her.

Summed up, appellants' argument is that testator's mother had the desire for his property and she had the ability and the opportunity to unduly influence him. Is that sufficient to reverse the finding of the trial court that there was no undue influence, even without considering any other circumstances which the trial court may have thought persuasive to his finding? We cannot say it is. Power, opportunity, and purpose to exercise undue influence, or possibility, conjecture, surmise and suspicion that undue influence has induced a will, alone cannot authorize the inference that such influence has in fact been exercised. (*Ginter v. Ginter*, 79 Kan. 721, syl. ¶¶ 6, 7, 101 Pac. 634.)

We find no trace of evidence in the record that the mother of testator, directly or indirectly, actually entered into the execution of the will. In *In re Estate of Hall*, 165 Kan. 465, 470, 195 P. 2d 612, we said:

"Natural human desire, motive and opportunity to exercise undue influence do not alone authorize the inference it was in fact exercised. Nor is mere suspicion or possibility of parties having induced the making of a will favorable to them as beneficiaries enough to justify a finding of undue influence. . . .

"The test of undue influence, sufficient to destroy a will, is that it must amount to such coercion, compulsion and restraint as to destroy the testator's free agency, and by overcoming his power of resistance, obliges or causes him to adopt the will of another rather than exercise his own. . . . The burden of establishing undue influence, of course, rests on him who asserts it." (p. 470.)

The burden was on appellants to prove undue influence by substantial evidence so that the trial court might determine by whom and in what manner it had been exercised and the extent to which it had affected the will. We conclude that appellants did not meet this burden in the court below, and the finding of the trial court that there was no undue influence must be sustained.

It is also urged by appellants that the trial court failed to give proper weight and consideration to the testimony of Doctor Conwell, a physician who qualified as a specialist in nervous and mental diseases. There is nothing in the record to indicate that the trial

court did not give the doctor's testimony the weight and consideration to which it was entitled. It should not have been considered to nullify all nonexpert testimony in conflict with it. Nonexpert testimony is competent on the question of mental capacity, and the trier of the facts is not bound to adopt the views and opinions of a physician to the exclusion of other nonexpert testimony regardless of the physician's expert qualifications. (*Mingle v. Hubbard,* 131 Kan. 844, 850, 293 Pac. 513; *In re Estate of Hall,* supra.)

There was argument and there has been some discussion concerning the fact that the testator lived a little more than one year and nine months after he made his will on May 5, 1945, with the assertion that during such a long period in which he was living apart from his mother and conducting his own business affairs, he had ample time to make a new will had he cared to do so. It is quite well settled, of course, that the time when a will is made is the time of primary importance to be considered in estimating testamentary capacity or any question of undue influence over the testator. However, evidence of capacity, conditions and circumstances existing after that time may be considered *only* to serve as an aid to determine the primary question (*In re Estate of Hall,* supra).

We have discussed at some length the testimony adduced at the trial of this case, and perhaps have labored it too long because of the rule so well established, that appellate courts are concerned only with the evidence which supports the findings and not with evidence contrary thereto. The only question before us is whether there was substantial testimony which could have convinced the trial court in making its findings. There is such testimony and we are precluded from disturbing the findings made thereon.

We have given this case a patient perusal and discovering no error, the judgment is affirmed.