No. 38,504

In the Matter of the Estate of John J. Wills, Deceased. MORRISON H. WILLS, Contestant, *Appellant*, v. WILLIAM H. WILLS, Executor, *Appellee*.

(240 P. 2d 141)

Opinion filed January 26, 1952.

*Tudor W. Hampton,* of Great Bend, argued the cause, and *Robert L. Jackson,* of Kansas City, Mo., *Bronce Jackson,* of Lyons, *S. R. Blackburn* and *Ed. R. Moses,* both of Great Bend, were with him on the briefs for the appellant.

*Ben Jones,* of Lyons, argued the cause, and *Edward Wahl,* of Lyons, was with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This proceeding originated in the probate court upon a petition of the executor named therein to probate the will of John J. Wills, deceased. The testator's son, Morrison H. Wills, filed written objections thereto. The matter was heard in the probate court and the will was admitted to probate. The contestant appealed to the district court.

On March 27, 1951, when the case came on for trial in the district court an advisory jury was qualified and sworn. The proponent of the will introduced his evidence. No demurrer was filed thereto and the contestor introduced his evidence. The subsequent proceedings are best shown by the journal entry, the pertinent portions of which read:

"Thereupon, and after the conclusion of the introduction of evidence of the contestor, Morrison H. Wills, the Executor, William H. Wills, demurred to the evidence and testimony of the contestor, Morrison H. Wills, for the reason and upon the grounds that said evidence and testimony wholly failed to establish or show that the testator, John J. Wills, was not of sound mind when the will was executed; that said evidence and testimony wholly failed to establish or show any undue influence or fraud alleged to have been exercised upon the testator, John J. Wills, by either William H. Wills or Bessie Mae Wills McIntosh or by anyone on their behalf; that said evidence and testimony wholly fails to establish or show the invalidity of said Last Will and Testament of John J. Wills, deceased; that said evidence and testimony wholly fails to overcome the presumption arising as to the validity of said will after prima facie showing that the instrument was duly signed and attested by the testator, John J. Wills, in the presence of witnesses and as to the prima facie showing as to the validity of said Last Will and Testament of John J. Wills, deceased.

"After hearing arguments of attorneys for both sides and after fully considering the evidence and testimony offered on behalf of the contestor, Morrison H. Wills, the Court finds that the evidence and testimony of the contestor wholly fails to overcome the prima facie case and proof made by the Executor in support of said Last Will and Testament of John J. Wills and wholly fails to establish or show testamentary incapacity of John J. Wills at the time of the execution of said Last Will and Testament, and wholly fails to establish or show any undue influence alleged to have been exercised upon John J. Wills in the execution of said Will, and wholly fails to establish or show any defense against the admission to probate of said Will of John J. Wills, deceased, and therefore the demurrer of the executor, William H. Wills is sustained. Thereupon the Court dismissed the jury from said case.

"Having further considered all the evidence introduced in said case and being further well advised and informed in the premises, the Court finds that the testator, John J. Wills, was, at the time of the execution of his Last Will and Testament which was attached to the petition of William H. Wills and marked 'Exhibit A,' of full age, of sound and disposing mind and memory, then fully

knowing and comprehending that he was executing his Last Will and Testament; that he knew the contents thereof; that he then knew the extent and nature of his property, the natural objects of his bounty, and the disposition of his property that he desired to make and did make.

"The Court finds that the instrument attached to the petition of William H. Wills, marked 'Exhibit A,' purporting to be the Last Will and Testament of John J. Wills, deceased, and attested by Homer Sharpe and W. W. Chandler as witnesses, is the true, valid and lawful Last Will and Testament of John J. Wills, a resident of Rice County, Kansas, who died at Lyons, Kansas, on November 27, 1950.

"The court finds that said Last Will and Testament of John J. Wills, deceased, has been duly attested and fully executed in all respects as provided and required by law and that said Will should be duly admitted to probate in the Probate Court of Rice County, Kansas as the true, valid and lawful Last Will and Testament of John J. Wills, deceased.

"It is therefore considered, ordered, adjudged and decreed by this Court that the demurrer of the Executor to the evidence and testimony of the contestor, be and the same is hereby sustained, upon the grounds herein set forth. It is the judgment, order and decree of this court that the instrument attached to the petition for probate, marked 'Exhibit A,' dated April 18, 1949, purporting to be the Last Will and Testament of John J. Wills, deceased, and attested by Homer Sharpe and W. W. Chandler as witnesses, is the true, valid and lawful Last Will and Testament of John J. Wills, deceased, and that the Probate Court of Rice County, Kansas, shall admit to probate and record said Last Will and Testament as and for the Last Will and Testament of John J. Wills, deceased. It is the further order of this Court that the contestor, Morrison H. Wills, together with the sureties upon his appeal bond shall pay the costs of this action."

In due time the contestor filed a motion for a new trial, which was heard on April 30, 1951, and overruled. The contestor appealed to this court and has presented the following specification of error:

"That the District Court of Rice County, Kansas, erred in sustaining the executor's, appellee's, demurrer to the appellant contestant's evidence in trial in the District Court of Rice County, Kansas. That the District Court of Rice County, Kansas, erroneously overruled the appellant contestant's motion for new trial."

The record discloses that on November 27, 1950, John J. Wills, about seventy-five years of age, a resident of Rice county, died leaving a will executed April 28, 1949, by which he devised two described quarter sections of land to his brother, William H. Wills, and one described quarter section of land to his niece, Bessie Mae Wills McIntosh, and named them as residuary beneficiaries of the remainder of his estate and appointed them to be named executors of his will. The will contained a paragraph which reads:

"Having heretofore made advancements to Morrison H. Wills, which I deem to be sufficient provision for him, I make no provision for him in this will."

At the time the petition to probate the will was filed Morrison H. Wills was a resident of Kansas City, Missouri. His written objections to the probate of the instrument offered as the will of John J. Wills were as follows:

"1. Said instrument was not executed by the decedent in the presence of each of the subscribing witnesses.

"2. Said instrument was not executed by the subscribing witnesses in the presence of each other or in the presence of the decedent.

"3. Said instrument was not acknowledged by the decedent as his last will to each of the subscribing witnesses.

"4. Said instrument was not declared to the subscribing witnesses to be the last will of the decedent.

"5. The subscribing witnesses did not subscribe to said instrument at the request of the decedent.

"6. At the time of the alleged execution of said instrument, the decedent was not of sound mind and memory, and was mentally incompetent to make a will.

"7. The said instrument was obtained by the exercise of undue influence on the decedent, and the exercise of fraud and misrepresentation on the decedent by William H. Wills and by Bessie Mae Wills McIntosh, which undue influence was exercised and which fraud and misrepresentation was employed by said persons for a period of many months prior to the alleged execution of said instrument and up to the time of such execution, but this respondent is without knowledge of the exact times and places of such actions. Such undue influence and such fraud and misrepresentation consisted of statements to decedent concerning this respondent, who was the son and only heir at law of decedent, calculated to cause and in fact causing unwarranted prejudice and unnatural dislike and hatred of respondent by decedent, all of which was done for the purpose of influencing and causing decedent to dispose of his property away from respondent and to said William H. Wills and Bessie Mae Wills McIntosh.

"Respondent further alleges that at the time of the making and preparation of said instrument William H. Wills and Bessie Mae Wills McIntosh, the principal beneficiaries under said instrument, occupied positions of trust and confidence to the decedent, that said principal beneficiaries prepared or caused to be prepared the said instrument, and that the decedent did not know the contents thereof and did not have independent advice with respect thereto."

In this court counsel for the contestor argued the case as though the trial court had ruled only on the proponent's demurrer to the contestor's evidence. We think that is too narrow an interpretation of the court's decree. As we view it, while it is true the court announced that it was sustaining the demurrer to the contestor's evidence, it is clear from the decree that the court went on and considered and weighed all of the evidence in reaching its conclusion.

An examination of the record discloses that the contestor presented no evidence in support of the first five paragraphs of his objections to the probate of the will. On the other hand proponent, in addition to the declarations of the subscribing witnesses to the will, called the witnesses, each of whom testified that he was an officer of the Chandler National Bank at Lyons, with which bank the testator had transacted business for many years, and on April 18, 1949, the testator came to the bank with an instrument which he said was his will and told them that he would like to have them sign it as witnesses; that they went in the back room of the bank, where only the three of them were; that John J. Wills said the instrument was his will and that he signed it in their presence and asked them to sign it as witnesses, and they did so, and that he took it with him. The record also fails to disclose any evidence on behalf of the contestor in support of the seventh paragraph or of the unnumbered paragraph following in his objections to the probate of the will. The objector called as a witness William H. Wills, named as executor in the will, who testified among other things that the first time he saw the will of John J. Wills was when it was opened in the probate court's office the next day after John's funeral; that he got the will out of the box at the bank the next day after the funeral; that Homer Sharpe was with him; that he had never been to the box before; that he did not see the will drawn; that he did not see it or have anything to do with it prior to the time it was opened in the probate court; that when he received it from the bank it was in an envelope which had written on it, "Last Will and Testament of John J. Wills," and the date and a statement that in the event of his death to notify his brother, William H. Wills.

With respect to the sixth paragraph of the written objections to the probate of the will to the effect that at the time the will was executed the testator was not of sound mind and memory and was mentally incompetent to make a will, the following evidence was introduced by the proponent. The subscribing witnesses testified in substance as follows. W. W. Chandler testified:

"I am a resident of Rice County, Kansas, and I have lived here seventeen years. I am the head of The Chandler National Bank here in Lyons. I have known John J. Wills since I came here in 1934, until his death. I did business with him and he did business with us and I have seen him frequently."

He testified about the execution of the will, as previously noted, and continued:

"From my observation and knowledge of John J. Wills, I am of the opinion he was of sound mind and memory. He did not appear to be different mentally from any previous occasion. I have no doubt of his mentality at the time of the execution of the will.

"At the time he signed the will he knew the nature of the act and realized what he was doing. He knew who his folks were and I considered him mentally sound and sufficient to do normal business transactions."

Mr. Homer Sharpe testified:

"I have lived in Lyons twenty-two years and have lived in Rice County all my life. I was county treasurer four years, city clerk two years, was mayor of the city of Lyons and am vice-president and cashier of the Chandler National Bank, Lyons. I knew John J. Wills about twenty years and had business transactions with him during that time. I had occasion to observe him physically and mentally. . . . From my observation of John J. Wills during the time I had known him and considering his business transactions, at the time John J. Wills affixed his signature to that instrument he was of sound mind and memory. He certainly knew what property he possessed and who his relatives were. Based upon my previous experience there is no question in my mind that John J. Wills had normal business ability."

William H. Wills, in addition to the testimony previously mentioned, testified:

"After his stroke in the spring of 1947, John J. Wills still took care of his business. During the month of April, 1949, and previous thereto and subsequent thereto, I observed him and it is my opinion he was capable of taking care of his own business. He did take care of his own business. I do not know of anyone who aided him. I did not notice any change in his mental condition after he came back from the hospital in July, 1948."

Mrs. Zoe Osen, called as a witness by the contestor, gave her address in Lyons and stated that she is the widow of a minister; that John J. Wills had a room at her house and was rooming there when she acquired the property about seven and one-half years before his death; that he became ill at her house in 1947 and asked her to call a doctor, which she did; that he said he felt dizzy; that while he lived at her house he read the Hutchinson paper and took the *United States News;* that she took the *Newsweek* magazine and once in a while he would ask her if she had noticed a certain article. They exchanged magazines. During his last illness she visited him at the hospital. He asked her to get his laundry and told her where it was. She visited with him the day of his death. He talked about a man who had stayed at her house with whom he had visited frequently and asked if he had come back. He asked if an insurance adjuster had come to adjust a small fire. He said he wanted to pay his room rent and asked her to hand him his trousers. She told him

his room rent was not due, but he said he wanted to pay it anyway. He took the money from his trousers and paid her the right amount.

"During the seven and a half years he lived at my house, including the period up to the time of his death, from my association with and my knowledge of him as far as I was able to tell he was of sound mind at all times."

He gave her a writing to the effect that if he should become incapacitated from any cause so as to be unable to attend to his business affairs no one should be authorized to take his belongings from his room except his brother, William H. Wills, to whom the writing was to be given.

This testimony would have justified, perhaps required, the court to find that there was no merit in the sixth paragraph of the contestor's objections to the probate of the will. But at sometime the contestor or his counsel conceived the view that the testator had an insane delusion to the effect that he was not the father of Morrison H. Wills. This had not been specifically mentioned in the written objections to the will, but perhaps might be included in the sixth paragraph thereof, and obviously the parties and the court so regarded it. The record as pertaining to that question may be summarized as follows: According to the testimony of William H. Wills the testator was born July 28, 1874, and was seventy-six years and four months of age at the time of his death. Obviously, he had been a resident of Lyon county for many years, perhaps all his life. On April 5, 1905, he was married to Bessie Hodgson. They lived together as husband and wife until 1932, when they were divorced on petition of the wife. Two children were born as a result of the marriage—a daughter, who died sometime while they were living together, the specific date not being shown—and a son, Morrison H. Wills. When he was prepared for college his father furnished the money for him to go to Kansas University and among other things provided him with an automobile. On March 21, 1931, while two young men were riding with him, he had an accident with the automobile which resulted in the death of one of the young men and the serious injury of the other; and also the testator's son, Morrison, was so seriously injured that he was confined to the hospital for fourteen weeks and left there with a cast on his back. When he left the hospital he returned home, but the relations between him and his father were strained and they had difficulties. The extent of that is not shown. Morrison testified:

"I believe that the wreck or the transaction that caused the death of one boy and my injury had something to do with my father's attitude."

The son did not return to school but stayed about home for a time and went to work in Lyons for an oil company. About that time—the specific date not being shown—the wife sued her husband for a divorce, and when she filed her petition she obtained an order enjoining the husband from returning to the home. The divorce was actually granted in September, 1932. Bessie Wills, called as a witness, testified that beginning soon after the children were born the husband sometimes referred to them as her children. Apparently this was not done in a way to be offensive to her, for she further testified that her husband did not show any adverse attitude toward Morrison until 1931-1932. About that time, referring to the son, he said: "He isn't my son, he is your damned offspring." Possibly the husband's attitude is best disclosed by two letters he wrote to his wife after the divorce. One was dated December 29, 1932, and the other July 28, 1936. These were introduced in evidence as a part of the testimony of Bessie Wills. Omitting the address and signature, the first one reads:

"I am still of the opinion that you owe me the difference between the $100 allowed for the taxes on the Welsh farm and the $66.99 tax which leaves $33.01 due me. You never had a dime when we was married. You had less than $100.00 worth of stuff to help start housekeeping with, you have never had an income or received anything since except what you received from me. I gave you a better home and easier life than any of your folks that I know of have had, you broke your marriage vows and every good promise you ever made to me. I owned one of the pretty homes of the community, 240 acres, was out of debt, I was out of debt and worth between $12,000.00 and $13,000.00. My mother gave me a ½ section which has paid large returns. In your disgraceful divorce action you forced me to give up, (or go into a dirty and expensive lawsuit) $27,560.72 in this is my home I had built the comforts I had gathered about me the presents my folks gave me. Your son cost me about $5,000.00 the three years he spent in K. U. and a cast with a broken back. Your son caused me a lot of grief, worry, humiliation and shame. You and your son set me out looking for a place to sleep, you failed to rob me of my lot in the cemetery, in your divorce petition you swore you can no longer live with me. I think that you and your offspring do not choose to be buried with me. I suggest that you buy my lot, and pay the $33.01 over allowance on the Welsh farm taxes for the year 1932."

The later one reads:

"You aided by your relation and friends robbed me of my life savings, and put me out of my own home, a home that you did not have a dollar invested in. You did not acquire title to my lot in the cemetery just north of Lyons, Kansas. I am paying to have that lot kept clean and tidy and somebody persists to clutter and litter this lot on Memorial Day, contrary to my custom and wishes. Since under your management all of the living mem-

bers of your own family except yourself are out of the home that I provided for them, it appears hardly likely that you would display such devoted benevolence upon the grave of the remains of one who died over twenty years ago.

"Your son Morrison Hodgson Wills caused me an enormous unnecessary amount of expense and grief, and after that he actively helped you rob me, and then he violated my orders and took my new typewriter against my wishes, and then refused to return it to me, and denied any knowledge of where it was at, thus I could not find or replevy my typewriter. I do not understand why he would come back here and clutter my lot.

"It may be some of your helpful Christian relation or friends who clutter up my lot. I want the practice stopped. You may know the guilty person, if so you may hand them this notice."

There was testimony that in 1947 the testator was not feeling well and asked Mrs. Osen to call a doctor. She called Dr. R. Leonard, who testified that he was called to testator's rooming house. When the doctor talked with him at the house he complained of being very dizzy, some headache and some nausea of the stomach and being very nervous. The doctor took him to the hospital, where he remained about a week. His predominating symptom was dizzy spells. The doctor testified:

"After we got him to the hospital, and my examination of him at that time was I couldn't conclude anything particularly about what was the actual trouble with him. I suspected he might be a little bilious; however, at his particular age, I carried in mind he might have had a slight cerebral hemorrhage, that is, or a blood clot in his brain, where something has happened in his brain."

Later the doctor saw him several times on the street and noticed he had a little trouble getting around. "He was slow and cautious like." Usually he had a cane, although the doctor did not notice much about that. His observations caused him to conclude, however, that he had had some sort of a cerebral accident. The doctor was a first cousin of the testator, who was much older, and the doctor had not known him before he began to practice medicine. He was asked if he had ever talked with the testator about his son. He spoke of one time at the bus station in 1944 or 1945. He asked the testator about Morrison, and he didn't know where he was. The doctor pressed the matter somewhat. He did not like it at all that the doctor had mentioned it, brought up the matter of the divorce and the boy going with his mother. When the doctor attempted to pursue the subject he walked away. The doctor testified:

"I never talked with him about Morrison but once and then he certainly did not give me any idea Morrison was not his son."

Cecil E. Bleger, called as a witness for contestor, testified he operated a tire business; that the testator was around his place often and carried a key; that he was on very friendly terms with him since 1926. The testator talked with him quite a little about the divorce proceedings and referred to Morrison H. Wills as a bastard; that it was a constant thing in his mind about what happened to him at the time of the divorce, and that his wife and son had run him off the place; that his stroke in 1947 affected his left side—the leg more than anything else—and he did not have too much control over it, and that he had pains in the back of his neck; that he went to the Ellsworth Hospital for a checkup and that the witness took him to Bell Memorial Hospital in Kansas City in July, 1948. At that time, and before, he had been worrying a little about his mental condition and seemed to have a fear that he might be sent to the Larned Hospital. The witness knew of several occasions when William H. Wills was at the testator's rooming house both before and after the will was executed, and that afterwards the testator would be upset and talked about "the outfit" and what they had done to him in the divorce action.

Mrs. Osen had testified that he went to the Bell Memorial Hospital. Before that he had gone several places, but when he came back from the hospital he did not say anything about going anywhere else.

At the time of deciding the case the court made an oral statement in which it said:

". . . and the court is saying that that will is a good and valid will, that at the time of the making of the will, Mr. Wills was capable. I am not saying that it is a fair will, I am not saying it is a proper kind of will, I am not saying it is a kind will, but I am saying it is Mr. Wills' will."

Following the court's decision the contestor filed a motion for a new trial upon the grounds of abuse of discretion by the court, the contestor was not afforded a reasonable opportunity to present his evidence to be heard on the merits, erroneous rulings of the court, the decision of the court was given under the influence of passion and prejudice, and the decision of the court was in whole or in part contrary to the evidence. This motion came on for hearing before the court on April 30, 1951. Although no notice had been given that testimony would be presented the contestor called as a witness Bessie Wills Good (she had remarried since the trial). It developed the testimony sought from her had been given at the time either

by herself or by the contestor. In colloquy between the court and counsel for contestor the court made the following statement:

"The court was under the impression all through this trial, and is under that impression now, that there wasn't any question of infidelity on the part of this mother; that that never entered into it, or never came into it, and wasn't even considered by the court. That is, the court at all times considered this was his son as well as her son; that he was a legitimate child, and that there wasn't any doubt about it."

The contestor called Cecil E. Bleger as a witness and reminded him of his testimony that he had been a close friend to the testator and asked if there came a time when that relation ceased. He replied in the affirmative and fixed the time as of about June 3, 1946. His further testimony developed that this came about because of a homicide in the neighborhood. Upon objection to that line of testimony the court inquired of counsel for the contestor what bearing it had upon the case. Counsel made a lengthy statement to the effect that this was preliminary to additional testimony which they planned to introduce which would show that the testator ceased his friendly relations with the witness and began relying upon his brother, William H. Wills, and to follow that with testimony tending to disclose that William H. Wills had the confidence of the testator before and after the will was executed and had prompted its execution. With that statement the court overruled all objections of the proponents of the will and permitted the contestor to go into that matter fully. In the course of that hearing a Mr. A. E. Crawford, county coroner, and Herman Knitter, sheriff of the county at that time, were called and gave testimony. Without going through this testimony in detail it is sufficient to say that after an investigation of all of the facts in connection with the death in question the officers had concluded it was a suicide. There was no prosecution of anyone; indeed, there was no inquest. The testimony went nowhere so far as attempting to establish the things the contestor's counsel stated he hoped to develop. The court overruled the motion for a new trial and in doing so took up the grounds of the motion seriatim and pointed out that nothing had been presented to the court with relation to it, or that there had been no contention that had substantial merit.

In this court counsel for appellant devote their brief to the subject of insane delusions. From the annotation upon Testamentary Capacity, Delusions, in 175 A. L. R. 882 to 975, they picked out excerpts from the opinions in cases in which wills have been set aside on the finding of an insane delusion of the testator. In the

same annotations they could have found as many or more with a contrary result. A somewhat similar compilation of cases is found in 21 Words and Phrases, permanent edition, pages 573 to 585. Our own cases of *Akins v. Akins,* 109 Kan. 453, 199 Pac. 922; *In re Estate of Millar,* 167 Kan. 455, 207 P. 2d 483, and *In re Estate of Walter,* 167 Kan. 627, 207 P. 2d 262, with the authorities cited there, cover the general principles pretty well. Here, however, we find no occasion to attempt to write extensively upon the doctrine. It seems clear that the trial court was not impressed with the slight evidence shown by this record that the testator had an insane delusion with respect to the parentage of his son. A judgment finding an insane delusion in this case would necessarily have been based upon one statement testified to by the divorced wife and upon the testimony of the witness, Cecil E. Bleger. The first was a statement in a more offensive form than he had made since the child was born. There is no real reason to say that any of them intended to infer lack of parenthood on the part of the testator. There is quite a little in the testimony of Mr. Bleger which would cause any court to consider it with care. Obviously, he was a very willing witness. The word the witness testified the testator used with reference to the contestor, if used, did not necessarily imply that he was not the father of the contestor. One of its definitions is, lacking in genuineness; of a kind similar to but of inferior quality. It is sometimes used simply as an insulting remark. (*Hayman v. State,* 47 Tex. Crim. Rep. 263, 83 S. W. 204, 205.) It seems clear that the court never construed these two accusations as establishing the fact that the contestor was illegitimate. Unquestionably the testator felt deeply aggrieved that his son, in whom he obviously had taken great pride, had so used the automobile which he had furnished him that one young man was killed and two others seriously injured, and that the son had assisted his wife in her divorce suit in which he had lost his home, of which he was proud, and substantially more. We are not retrying that divorce case, which apparently was not contested, for perhaps something could be said on the other side. We are not saying he was justified in being aggrieved. But that he was deeply aggrieved by those circumstances is clear from the two letters he wrote his wife afterwards, as well as from other evidence, and finally in the will he stated his own reason for making no further provision for his son. That reason was not that his son was an

illegitimate child. The trial court heard the evidence and concluded that the will was duly executed and that it was valid in every respect. There was ample evidence to sustain the judgment of the trial court. There was no error in overruling the motion for a new trial.

The judgment of the trial court is affirmed.